SOMMERVILLE, J.
Joseph C. Segura, white, and Mary Miles, colored, lived together in concubinage in this state from a time prior to the late Civil War until her death, February 19, 1912. Four children were born to this irregular union: Ellis Segura, St. Clair Segura, both residents of the parish of Iberia; Miary G. Segura, wife of James F. Child, residing in Washington City, D. C., who were all born during the existence of slavery; and Adolph Segura, also a resident of Washington, D. C., who was born in the year 1873. On August 27, 1912, by public act, J. C. Segura acknowledged and legitimated the four above-named children. He died December 11, 1912, at the age of 93 years, unmarried, intestate, and without forced heirs; and left an estate inventoried at $76,703.
The collateral heirs of deceased, of whom there appears to be a large number, attack the act of legitimation on sixteen separate grounds; and ask that it be declared null, and that they be recognized as his heirs.
The legitimated children answer, and ask that the act of legitimation be declared valid, and that they be recognized as the legal heirs of their deceased father, and put into possession of his estate.
There was judgment in favor of the legitimated colored children of the deceased, and the white collateral heirs have appealed.
These heirs allege, first, that the persons named in the act of legitimation by their deceased relative were not his offspring. The evidence in the record shows conclusively that they were the offspring of the deceased and Mary Miles, his colored concubine.
Secondly, 'they allege that said persons were not the natural children of the deceased. The Code provides that:
“Illegitimate children who have been acknowledged by their father are called natural children,” etc. Article 202.
And Act No. 68 of 1870, p. 96, provides:
“That natural fathers and mothers shall have power to legitimate their natural children, by acts declaratory of their intentions, made before a notary public and two witnesses: Provided, that there existed at the time of the conception of such children, no other legal impediments to the intermarriage of their natural father and mother except those resulting from color or the institution of slavery.”
[1] The Civil Code, art. 200, and Act No. 68 were both adopted by the Legislature in 1870, and there is some conflict between ■ them. But act No. 50 of 1870, p. 80, provides:
“That all the acts and joint resolutions passed during the present session of the General Assembly which may be contrary to or in any manner conflict with the acts of the present session known as ‘The revision of the statutes of a general character, and of the Civil Code and Code of Practice,’ shall have precedence of said revisions, and be held as the law in opposition thereto, and as repealing those acts, so far as they may be in opposition or conflict.”
*87 So that, while Adolph Segura was the only child born to the deceased and Mary Miles at a time when the parties might have married, in 1873, and the other three were born in slavery, when the parties might not have married; yet these three fall within the terms of the proviso of Act No. 68 of 1870 above quoted, as there was “no other legal impediments to the intermarriage of their natural father and mother except those resulting from color or the institution of slavery.”
The collateral heirs argue, because of the passage of Act No. 54 of 1894, p. 63, prohibiting marriage between white persons and persons of color, that a white person is now prohibited from legitimating his colored children. Act No. 54 does not attempt or pretend to repeal the act of 1870 on the matter of legitimation. We so held in Davenport v. Davenport, 116 La. 1009, 41 South. 240, 114 Am. St. Rep. 575, and in the Succession of Yoist, 132 La. 309, 61 South. 384. These decisions settle the point adversely to the pretensions of appellants.
Under the Code of 1825, there was only one form of legitimation, and that was by the subsequent marriage of the parents of natural children. But, in 1831, article 217 of the Code of 1825 was amended by striking therefrom the words “every other mode of legitimating children is abolished.” In that) year, by Act No. 37, p. 86, the law with reference to legitimation as contained in Law 7, title 15, of the 4th Partidas, which had been repealed by the article of the Code, was thereby revived; and it was further provided;
“That natural fathers and mothers shall have the power to legitimate their natural children by acts declaratory of their intention, made before a notary and two witnesses: Provided, that nothing herein contained shall be so construed as to enable a white parent to legitimate a colored child, or to prevent a free person of color to legitimate his colored children: Provided, the natural children are the issue of parents who might, at the time of the conception, have contracted marriage; and, provided, that there do not exist on the parent legitimating his natural offspring ascendants, or legitimate descendants.”
And the different modes of legitimation provided in the Code and .under the act continued to be the law until the passage of Act No. 68 of 1870, p. 96. And, under the law as it formerly existed, J. C. Segura could not have legitimated his children, for the reason that he was white and their mother was colored; and, again, as to three of them, because they were born in slavery, at a time when he and their mother could not have married.
In the Revised Statutes of 1870, §'2173, the above law of 1831 was amended, and the word “enable” was changed to read “prevent,” as follows:
“Nothing herein contained shall be so construed as to prevent a white parent from legitimating a colored child, or to prevent a person of color from legitimating bis colored children.”'
And this last inhibition was removed by act No. 68 of 1870, p. 96, by enlarging the proviso so as to read:
“That there existed at the time of the conception of such children, no other legal impediments to the intermarriage of their natural father and mother except those resulting from color or the institution of slavery.”
And, as the only impediments to the marriage of J. C. Segura and Mary Miles at the time of the conception of their children resulted from the colors of the parties and the fact that Mary Miles was a slave, the deceased had the legal right to legitimate his colored children by public act, as he did in 1912.
The third, fourth, fifth, sixth, and seventh grounds are disposed of in the foregoing, ruling.
The eighth ground of objection is that the act of legitimation “is not such an act as contemplated by law, in that it is not witnessed by two competent witnesses.” The names of William Rhodes and William B. *89 Davis are signed to the act as witnesses, and they appeared as witnesses during the trial of this cause, and testified that they had signed said act.
The charges numbered 9, 10, 11, and 12, to the effect that the deceased was insane, was suffering from senile dementia, was of unsound and unbalanced mind, was incapable of using his judgment and giving his consent, was coerced into making this supposed act of legitimation, and that misrepresentations were practiced upon him, will be considered together hereafter.
The next attack is made against the act itself, in that:
It “has been erased completely as to material facts, and other words substituted in the places of the words erased in such a manner as to alter the meaning of the act, all after signing and execution of said act, and contrary to the. law on the subject.”
The act is in the original before us. There are some erasures apparent after a very careful inspection of the act. But these erasures do not cover material parts of the instrument, and the words substituted are not necessary for the validity or understanding of the act. In other words, those parts or words are not material. And the words were erased and others substituted, as certified on the act itself by the notary public, before it was signed and passed. The witnesses testify to that effect on the witness stand. These witnesses further testify that after the act was written the deceased objected to the word “natural” in referring to his children, and he directed that the words “own dear,” “dearly loved,” and “own true dear” should be used instead of the terms “natural” children, and “natural” parents. The substituted words “own true dear,” etc., may be entirely left out of the instrument without affecting it in any degree.
[3] The fourteenth objection is that the act of legitimation was passed by J. R. Davis after his commission as notary public had lapsed, by reason of the fact that notaries public are required under the law to furnish new bonds at the expiration of every five years, and that J. R. Davis had failed to renew his bond which expired July 10, 1912.
The evidence shows that J. R. Davis had been acting notary in the parish of Iberia for several years, that he had filed his bond, as is required by law, with the clerk of the court, but that he failed to renew same, so as to keep his commission alive. He was therefore not a notary de jure at the time he passed the act of legitimation. But in the case of Davenport v. Davenport, 116 La. 1009, 41 South. 240, 114 Am. St. Rep. 575, we say:
“We think it would be an intolerable hardship to require every one who needs the services of a notary to ascertain first, under pain of nullity, whether he has or not filed his oath or- bond with the Secretary of State, etc. If the notary is a notary de facto it is safe to have recourse to him.”
We adhere to the above ruling, and hold that the act of legitimation in this case was passed before a de facto officer, and that it is legal in form.
The fifteenth charge is that there is a written contract between the notary who passed the act of legitimation and who is one of the counsel in this case, with these legitimated children, which fixes a fee to be received by said attorney.
The only evidence attempted to be offered on this point was the testimony of J. R. Davis himself, under cross-examination, taken under a commission, which evidence was objected to on several grounds by the collateral heirs, and one of which objections should have been sustained. We have not therefore examined the testimony. And we do not appreciate the charge made in the petition.
The sixteenth and last objection is -to the act of legitimation on the ground that it “is fraudulent and was illegally and fraudulently framed to defraud your opponents of their legal rights as heirs of the deceased.” *91 There is no evidence to sustain the allegation of fraud.
[2] J. R. Davis, whose testimony was taken under commission, was one of the counsel for the legitimated children, and he signed the petition to take his own testimony under commission, because of his illness and inability to appear in court. He, L. T. Dulany, and Ventress X. Smith signed the pleadings. And the order to take his testimony was addressed to the same Ventress J. Smith, as judge ad hoc of the city court; and said counsel, Ventress J. Smith, executed the commission, and took the testimony of his associate counsel, Davis. The collateral heirs made timely objection, and the order for him to take the testimony should have been rescinded.
The Revised Statutes, § 615, provide that testimony taken under commission shall be taken by the clerk of the court, “or some other disinterested person”; and we hold in Key’s Curator v. O’Daniel, 10 Mart. (O. S.) 441, that:
“The deposition of a witness must be reduced to writing by him, the justice, or an indifferent person. It is inadmissible in the handwriting of the party or his counsel.”
This ruling was repeated in Union Bank v. Lamothe, 6 Rob. 5; and in Craig v. Lambert, 44 La. Ann. 888, 11 South. 464, where we say:
“A counsel or an agent is incompetent to execute a commission under which witnesses are examined in the case of client or. principal.” Bledsoe v. Jones, 145 Ala. 685, 40 South. 111.
The objection to the testimony of Mr. Davis should have been sustained; but that testimony is not necessary to be considered on the determination of the cause, and we shall not remand the ease because of the erroneous ruling.
[4] Turning now to a consideration of the testimony offered in support of the allegation that the deceased was insane, was of unsound and unbalanced mind, was suffering from senile dementia; that he was incapable of using Ms judgment, or of giving Ms consent ; that he was coerced, and forced to sign the act of legitimation; that misrepresentations were practiced upon this old, helpless, and aged man; and that he was misled into signing this act — we find it most conflicting, as is usual in such cases.
There was no evidence offered to show coercion, force, or misrepresentation.
The testimony in the record does not disclose the origin or birth of the deceased. It shows that he was peculiar and eccentric in his temperament, in Ms tastes, and in his life. He occupied Ms time in raising and selling cattle, and he amassed quite a fortune. He appears to have exercised excellent business judgment, and to have regularly pursued .his daily avocations to within a short time of his death, which occurred at the age of 93 years. 1-Ie purchased valuable real estate; and he refused to sell any of it at all times. He led an outdoor life, spending most of his time with the cattle on Ms vast prairie, where he transacted all of his business, and where he often slept. 1-Iis life was rather that of a nomad than as a member of a community. He had few, or no, associates; and those he had were mainly of the colored race. He showed an utter disregard for the refinements of life, cultivation, and for the opiMons of his neighbors. 1-Iis life was evil, dissolute, selfish and shameful. He publicly consorted with Ms colored concubines, chiefly with the mother of his children, who was at one time Ms slave; and he lived continuously and openly with her until the day of her death. He treated Ms children well, caring for them and sending them to school; and they are married, and appear to be respectable members of the communities in which they live. He gave to their mother, Ms concubine, liberally from his fortune, during her lifetime. He does not appear to have held much, if any, intercourse with *93 his white relatives, many of whom are here contesting for his estate.
That this unfortunate and peculiar man, particularly in his extreme old age, developed gross and objectionable habits, is not strange. Some of the acts testified to by witnesses for his relatives indicate absolute disregard for the proprieties of life and for the feelings and sensibilities of others. The most. extreme act testified to was that he had at times defecated openly on his prairie, and in the presence of others. But such acts are not positive indications of insanity. 1-Ie was on his own property, and did with his own and himself as he pleased, in disregard of the feelings of all other persons.
Other witnesses testify that during the last years of his life the deceased failed, at times, to recognizé them, and to call them by name, although he had been acquainted with them for years; and they attributed his conduct to senile dementia. It may well be that the deceased, in the latter part of his long life, was not in the full possession of all of his faculties; and he may have preferred to not recognize said witnesses. His faculties had, doubtless, failed to an extent. But other witnesses who saw and knew the deceased testify very positively as to his soundness of mind, and his ability to transact business of importance with them at the time referred to by the other witnesses. And the witnesses who were present at the passing of the act of legitimation, and they are disinterested, testified that the mental condition and understanding of the deceased at that time was strong and clear. The document was read to him by the notary, and he said that the act contained his. wishes, but that he desired some of the language used therein to be changed. That he did not wish to refer to his children as his “natural children,” but to call them his “own dear children,” and that he and their mother should not be referred to as “natural parents,” but as their “own true dear parents.”
After a full consideration of all the testimony as to the mental condition of the deceased, we are of the same opinion as was the trial judge, who saw and heard all the witnesses, that J. O. Segura was not afflicted with insanity or senile dementia; and that the act of legitimation by the deceased is a valid and binding document, or act; and that the children legitimated by him are his heirs, and are entitled to his estate.
Judgment affirmed.