### PITRE v. GUIDRY et al.
### No. 1074.

Court of Appeal of Louisiana. First Circuit. April 17, 1933.

Dubuisson & Dubuisson, of Opelousas, for appellants.

Atlee P. Steckler, of Ville Platte, for appellee.

ELLIOTT, Judge.

Louise Pitre, widow of Carmen Pitre, suing for herself, and also for the use and benefit of her minor child, Betty Joe Pitre, claims of Zannie Guidry and the Travelers' Insurance Company the compensation provided for by Act No. 20 of 1914, § 8 (amended by Act No. 242 of 1928) in favor of the widow and minor child of an employee who has lost his life in the service of his employer.

She alleges that her husband, Carmen Pitre, employed by Zannie Guidry, was instructed to assist other employees in piling on the platform of the People's Gin Company at Erath, La., certain bales of cotton upon each other, so that other bales of cotton could be brought forward and loaded on trucks.

That while performing his duty, assisting as stated, a bale of cotton accidentally fell on his chest, causing him severe internal injury, resulting in the development of trau-matic pneumonia, of which he died the following day.

That the Travelers' Insurance Company carries the said Guidry's compensation insurance, and that said Guidry and the Travelers' Insurance Company should therefore be compelled to pay her, individually and also for the common use and benefit of Betty Joe Pitre, the sum of $8.32½ a week for a period of three hundred weeks.

She also claims the further sum of $50 for burial expenses and $9 as physician's fees on account of the death and burial of her husband, and prays that 20 per cent. of the amount recovered be allowed her attorney, with privilege on the amount of the award.

The defendants appeared together, and by one and the same answer denied liability to the plaintiff. They deny that Carmen Pitre lost his life as the result of an injury. They set up in their answer that he died as the result of lobar pneumonia, contracted by him the night preceding the day on which he is alleged to have been injured, while driving a truck load of cotton from the gin where he worked, to Lake Charles. That the truck was equipped with a windshield and adjustable glass windows, and said Pitre could, and should, have protected himself from the cold night air; but he neglected to do so, became chilled, and the exposure following the heat suffered by him while loading the cotton resulted in a severe congestion which culminated in his illness and death.

There was judgment in favor of the plaintiff as prayed for. Defendants have appealed.

The judgment of the lower court is based on written reasons, leading to and concluded by the judgment rendered.

■ Defendants contend in their original brief that the opinion presents a partisan view of the facts prepared by the attorney for the plaintiff, and not by the judge a quo.

Plaintiff, in a supplemental brief, refers to defendants' averments on this subject as an attack on counsel and the court.

The plaintiff does not deny defendants' contention, so we feel that we must look on defendants' complaint in this respect as a matter which the plaintiff does not deny.

The control of and general supervision over all inferior courts is vested in the Supreme Court.

We consider that we must take cognizance of this complaint, but will go no further than the review of the present appeal requires at our hands.

■ The Constitution, article 7, § 43, provides that all district judges, in contested civil cases wherein there is a right of appeal, when requested by either party, shall give, in writing, a finding of facts and reasons for judgment. In this case the record contains

no request; but when written reasons are given, no matter whether pursuant to request or not, they come up with the judgment as reasons therefor. In acting on the case we may approve the judgment and disagree with the reasons.

Nevertheless, when the judgment appealed from is based on the credit given by the court to the testimony of certain witnesses who claim to have seen an occurrence calculated to produce serious bodily injury to a fellow workman, and who have likewise testified to the subsequent acts and conduct of the party injured, which apparently and might be reasonably taken as the result of the injury they have seen their fellow workman receive, and this fact is set forth in the reasons for judgment, then it follows that anything which detracts from the weight of the reasons must to the same extent have bearing on the judgment.

In Key's Curator v. O'Daniel, 10 Mart. (O. S.) 441, the deposition of a witness had been reduced to writing by the attorney for the plaintiff. The plaintiff sought to introduce the deposition in evidence, but the defendant objected, on the ground that same had been reduced to writing by plaintiff's counsel. Martin, J., said, in acting on the objection: "The deposition of a witness must be reduced to writing by him, the justice, or an indifferent person. It is inadmissible in the handwriting of the party or his counsel." This ruling was concurred in by Matthews, J. This ruling was followed in the Union Bank of La. v. Lamothe et al., 6 Rob. 5. The language used subsequently became statutory law, Act No. 114 of 1868, now section 615 of the Revised Statutes, and has since been recognized in Craig v. Lambert, 44 La. Ann. 885, 11 So. 464, and Succession of Segura, 134 La. 84, 63 So. 640. These authorities and the statutory provision mentioned have no application to defendants' complaint except by analogy.

In the present case, the opinion is an official act of which we take cognizance, and give it the weight which we think it should have, in acting on the facts of the case.

Carmen Pitre was a negro man; his wife, the plaintiff, is of the same race. The evidence shows that Carmen Pitre was employed by Zannie Guidry to drive a truck or do anything else about the gin that his superior directed him to do. He was set to work with Calise Hebert, Hebrard Hebert, and Albert Dartez, all white men except himself, to moving some bales on the gin platform by piling them on each other so that an open passage might be formed to the end that other bales that had been sold could be brought forward, loaded on the trucks, and hauled to the compress at Lake Charles.

Calise Hebert, one of the men employed in hauling the cotton, testified, saying:

"We (referring to Hebrard Hebert, Albert Dartez, Carmen Pitre and himself) were lifting a bale, and when we lifted it to pass it over the other (meaning another bale of cotton), we dropped it, and it fell on his stomach.

"Q. What do you mean by saying it fell on his stomach? A. On his chest, right here."

This witness further testified that he had worked with Carmen Pitre all the season, presumably at the gin where the accident happened, and that Carmen Pitre had not complained, acted nor looked like he was sick until after he was hurt on the occasion just mentioned. That they had to remove the cotton from Pitre, which had fallen on him; that Pitre complained right then, and had to lie down, and never was able to do anything afterward, saying that he was hurt. That when the bale of cotton was taken off him he walked, stooping, groaning, and lay down. That he asked them to do something for him, saying he was mortally wounded.

Albert Dartez says that they were piling cotton bales on top of each other in order to get at those that were to be hauled to Lake Charles.

"Q. What happened then? A. We were rolling a bale of cotton, and it fell against his chest, and he was against a bale of cotton.

"Q. What happened after this bale of cotton fell on his chest? A. We finished putting it over there, and he went and lay down on the other bales of cotton there. * * *

"Q. How did the cotton bale fall on Carmen Pitre? Was he standing up at the time it fell on him? A. Yes, sir. He was straining on the bale."

In another place, he says that after they lifted the bale of cotton from Pitre, Pitre helped them roll the bale up, and then went and lay down.

Hebrard Hebert says:

"Q. How did he get hurt? A. He was rolling a bale of cotton, and it jammed him against another, against his chest.

"Q. Were you there? A. Right by him.

"Q. Did you see that? A. Yes. * * *

"Q. What did Carmen Pitre do after you all took the bale off? A. He went to lie down. He could not work any more. He was hurt too much."

This witness further says that the next morning Pitre appeared to him to be dying. That pursuant to instructions from his superior, he took Pitre home next morning. The gin where he worked was at Erath and his home was in Ville Platte. This witness testified that it appeared to him during the morning that Pitre was not in his right mind, yet in going from Erath to Ville Platte he says that Pitre showed him the way.

The evidence shows that the average weight of a bale of cotton is about five hundred

pounds. That the bale which witnesses say they were lifting fell a distance of three or four feet and struck Carmen Pitre while he was standing, mashing him against another bale.

Otto Boudreaux, manager of the gin, says that Albert Dartez and Calise Hebert came to him, and told him that they wanted another man to replace Carmen, because he had been mashed by a bale of cotton. We understand that this was following the alleged injury. This testimony was objected to, on the ground that it was hearsay. Otto Boudreaux was Zannie Guidry's manager at the gin; consequently this statement made to him by these men employed at work with Pitre in moving cotton was, we think, admissible as a contemporaneous incident of the work; but if Boudreaux' statement be looked on as excluded, the testimony of the two Heberts and Dartez establishes the case with sufficient certainty.

Dr. Attaway testifies that traumatic pneumonia may develop almost immediately following an injury. In giving his testimony, he quoted from an author on medicine, as follows: "Under this heading, I have put all injuries to the lungs, whether the injury be inflicted by a blow upon the chest, by the aspiration of foreign bodies or fluids or the inhalation of irritating gases. In many instances the aspirated material contains virulent organism, and the pulmonary injury and infection occurs almost simultaneously. In other instances, the aspirated material is sterile, or contains only a virulent organism, but the trauma makes the lung susceptible to invasion by virulent organism entering through the bronchi."

Dr. Littell was called to examine Carmen Pitre about 12 o'clock of the day he arrived at Ville Platte, and which was the day after the alleged injury. Dr. Littell did not make any particular examination of Pitre. He says that he saw he was dying, but that Pitre kept telling him that he was suffering in his chest. Dr. Littell diagnosed the case as lobar pneumonia, but he admits that at the time he had not been informed of the accident which had taken place the previous day at the gin.

Dr. Boudreaux was called by the defendant Guidry to see Carmen Pitre about two hours after he had been injured. Dr. Boudreaux says that the patient's mind was clear at the time he saw him. It appears from his testimony that he was only with him a short time, perhaps less than a half hour. He says that Pitre told him that he had had a severe chill and felt very badly, suffering pain and headache. Dr. Boudreaux thought that Pitre had a temperature of about 102. He did not detect any symptoms of pneumonia, but says that it was possible that pneumonia was beginning and could have developed within six or twelve hours afterward. He testifies that

Pitre said nothing to him about having been injured at the gin, say, about two hours before. He diagnosed the case as due to malaria. Dr. Boudreaux only saw Pitre on the day he was injured, and it does not appear from his testimony that he was at the time aware of the accident testified to by the two Heberts and Dartez.

Dr. Landry was called to see Pitre about 8 o'clock the next morning. This was about eighteen hours after Dr. Boudreaux had seen him. Dr. Landry found him very weak, coughing incessantly, and spitting frothy blood; pulse, 140; very weak and compressive; respiration, 60; and the patient seemed very ill. He says that Carmen Pitre. told him that he had been ill (well) all his life, and had never been sick before; that he had gotten very hot while unloading cotton in Lake Charles on the night preceding the day he is alleged to have been injured, and while on the trip back had gotten chilled, and on arriving at Erath felt bad and had chills and fever; that Pitre said nothing to him about having been mashed by a bale of cotton the preceding day.

Dr. Landry diagnosed the case as acute lobar pneumonia. He saw that Pitre was fatally ill, and advised that he be carried home. We understand Dr. Landry as saying that, at the time he examined Pitre, the difference between lobar and traumatic pneumonia was not distinguishable under the external examination which he made; that nobody informed him that Pitre had been injured the previous day; and that he saw no signs of delirium in Pitre at the time he was with him.

The defendant Guidry, in giving his testimony on the subject, says that when he reached the gin, "I saw the nigger coming down, staggering and full of perspiration. I said, 'What's the matter, Carmen?' He said, 'I'm sick.' I asked him if he wanted the doctor. He told me, he did," and that he told the men there to fix him a bed the best they could, and they laid him down on the sample table, and he sent for the doctor.

This defendant was questioned whether he was informed, at the time he arrived at the gin, about the accident that had happened to Pitre, and his answer was that he did not recollect it. The failure of Mr. Guidry to remember the matter is overcome, in our opinion, by the positive declaration of the two Heberts and Albert Dartez, each of whom testified that they did tell him about it as soon as he arrived at the gin.

The plaintiff testified that she first saw her husband, Carmen Pitre, when he arrived at home about 4:30 p. m. the day after he was hurt. That she asked him what was the matter with him; and he said he was suffering as a result of a bale of cotton that had injured his chest, but, due to his suffering, she did not question him at length.

The defendants contend the testimony of

Drs. Boudreaux and Landry that Pitre did not mention to them the fact that he was injured, when the evidence shows that only about two hours had elapsed after his alleged injury at the time Dr. Boudreaux reached him, and about eighteen hours before he was visited by Dr. Landry, but did tell them he had suffered a chill, etc., and their opinions that he died with lobar pneumonia, is entitled to greater weight than that of the two Heberts and Albert Dartez, who testify that he was struck on the chest by a bale of cotton while standing, jamming him against another bale, and who further testify to his manner, appearance, and conduct immediately following. All the medical testimony may be said to have been to the effect that an injury caused in the way stated, if severe enough, could have caused traumatic pneumonia.

We think defendants claim too much for the opinion testimony on which they rely.

There is no incentive on the part of the two Heberts and Dartez to misstate and make out that their negro helper had been mashed in the way by them stated, when such was not the truth. It is true, no doubt, that a friendly and sympathetic feeling existed for their helper, but that was not a sufficient motive for giving false testimony for the purpose of enabling his widow to recover from their employer, with whom they were also apparently on friendly terms. They appear to be credible witnesses, and their direct and positive statements that they saw Pitre mashed, and as to what they saw and observed him do immediately afterward, is stronger evidence than a mere opinion based on a history that did not inform the physicians of the mashing which he had recently endured.

In the Succession of Ford, 151 La. 571, 92 So. 61, 64, the court approved an opinion, from which we copy as follows: "This court has the greatest respect for the physicians who have testified in this case, and has carefully weighed their testimony, along with that of all the other witnesses in the case, but, however weighty opinion evidence may be, and however plausibly it may be supported by theoretical reasoning, in courts of justice such opinions must yield when opposed to facts."

Ruling Case Law, vol. 2, subject, Expert and Opinion Evidence, § 7, p. 573, is to the same effect.

The positive and direct testimony of the two Heberts and Dartez, all of which is reasonable in itself, establishes the mashing and the traumatic origin of the pneumonia of which Pitre died and seems to be the only proper and reasonable conclusion to reach as to the cause of death under the other medical testimony in the case.

There is one matter, however, in which we find the lower court has erred. The plaintiff recovered judgment in the lower court for $50 on account of burial expenses, and $9 on account of physician's fees.

The plaintiff alleges in her petition that the defendants are due her these amounts, but in the prayer of her petition there is no request that she have judgment for these items, and on the trial of the case there was no evidence introduced in support of this part of her claim. Under the law, every item of damage must be proved.

The judgment appealed from, to the extent these items are allowed, is erroneous, and it will be amended and corrected in that respect.

For these reasons, the judgment appealed from is amended and corrected so as to disallow and reject therefrom the item of $50 allowed on account of burial expenses and $9 allowed on account of physician's fee, but subject to this amendment and correction the judgment appealed from is correct and now affirmed.

Defendants-appellants to pay the costs in the lower court; plaintiff-appellee the costs of appeal.