**WADDELL v. LANGLOIS et al., and three other cases.**

**No. 1405.**

Court of Appeal of Louisiana. First Circuit.

Jan. 21, 1935.

J. Y. Sanders, Jr., and Ben R. Miller, both of Baton Rouge, for appellants.

Chas. A. Holcombe, of Baton Rouge, for appellees.

*ELLIOTT*, Judge.

Frederick F. Waddell, plaintiff in suit No. 7169, alleges the death of his daughter Julia Waddell in an automobile collision on May 8, 1931, while riding in a motortruck as the guest of Wilmer Langlois. He alleges that the automobile in which she was riding was being driven by said Langlois, and that the collision was due to the fault and negligence of said Langlois in driving said truck; that said Langlois was a minor at the time, living with Joseph Aubin Langlois, his father. The liability of the son and of the father for the

acts of his son is claimed on that account. He further alleges that his daughter was unmarried; that she was the child of his first wife, who had departed this life years before. Damages are claimed of the father and son in solido in the amount of $10,000.

Suit No. 7170 is by Ernest Davis. He alleges that he was riding as a guest of Wilmer Langlois in the above-referred to truck at the same time and was greatly injured in the collision; that the collision was due to the fault and negligence of Wilmer Langlois in driving, and claims damages of father and son in solido in the sum of $9,832.90 on said account.

Suit No. 7503 is by Frederick F. Waddell against Istrouma Water Company, Inc., and Employers' Liability Assurance Corporation of London, England. He alleges in this suit that the truck which Wilmer Langlois was driving was the property of the Istrouma Water Company, Inc. That Wilmer Langlois was the employee of Istrouma Water Co., Inc., and was driving said truck as its employee at the time in the performance of the functions in which he was employed. That Employers' Liability Assurance Corporation, Limited, of London, England, carried the liability insurance of Istrouma Water Company, Inc., at the time. He therefore claims of the Istrouma Water Company, Inc., and of the Employers' Liability Assurance Corporation, Limited, in solido, damages to the extent of $10,000 on account of his daughter's death.

Ernest Davis, plaintiff in suit No. 7518, claims damages of Istrouma Water Company, Inc., and Employers' Liability Assurance Corporation, Limited, in solido, on the same ground of fault and negligence alleged by Frederick F. Waddell in the sum of $9,832.90 on account of his injuries.

The defendants, Wilmer Langlois, Joseph Aubin Langlois, Istrouma Water Company, Inc., and Employers' Liability Assurance Corporation, Limited, filed separate answers setting out their defense in detail and deny liability in each case. They all deny the fault and negligence on which their liability is claimed by the plaintiff, but allege in the alternative contributory negligence on the part of Davis and Julia Waddell leading to the collision and contributing to bring it about. They each pray that plaintiff's demand be rejected.

There was judgment with written reasons rejecting the demand of the plaintiffs in each of the suits.

The plaintiffs Ernest Davis and Frederick F. Waddell each have appealed.

The four suits were consolidated and tried together in the lower court and acted on in one opinion. We will follow the same course in acting on the appeals.

Pages 70–77 and 78 of the note of testimony are missing, and the transcript is not certified to as being complete. There is no certificate on the part of the clerk of court that it contains all the testimony. The three missing pages and lack of certification have either been overlooked, else are regarded by the parties as not important. There being no complaint, we take it that the record is complete; that all the important testimony adduced on the trial bearing on the issues in the case is before us. We will during the course of the opinion refer to Istrouma Water Company, Incorporated, as the water company, and to the Employers' Liability Assurance Corporation, Limited, as the assurance corporation.

The petitions aver and the evidence shows that Wilmer Langlois was 20 years of age at the time of the collision, and resided with Joseph Aubin Langlois, his father; that Julia Waddell was unmarried, and that Wilmer Langlois was employed by the water company. His work consisted in going to and from the premises of customers for the purpose of making repairs of equipment, turning on and off water, caring for and removing meters, assisting in making collections, etc., and to facilitate his work, he was furnished with a motortruck. Joseph Aubin Langlois, his father, was also in the employment of the water company and had the right to use the truck in connection with his work. The truck was kept at night on the premises of Joseph Aubin Langlois, and when the day's work was over, and if Wilmer was using the truck, it was his duty to drive it home and put it in the garage. Wilmer's work was from 7 o'clock a. m. to 5 o'clock p. m., but he was also required to do emergency work at night. For instance, if a fire occurred or other emergency happened, his employment required him to go to the place and assist in doing whatever was necessary in behalf of the water company.

During the evening of May 8, 1931, presumably after his day's work was over, he drove the truck home but did not put it in the garage. He got out of it when he reached home and changed his clothes in order to attend a weinie roast on the Comite river about 9 miles north of Baton Rouge. To change clothes he no doubt went in the house. Just how long he was thus engaged does not appear, but after doing so he returned to the

truck, got in it, and drove to the picnic. It was on his return from the picnic that the collision occurred. The occurrence took place at about 10:30 p. m. while he was driving Miss Waddell from the weinie roast to the place where she worked in the General Hospital at Baton Rouge. The entire trip was made after work hours, and was not connected in the slightest way with emergency or night work in behalf of his employer. Plaintiffs argue in their brief that the truck was being driven home at the time of the occurrence, that is, to the premises of Joseph Aubin Langlois, where it was kept at night, but argument cannot create an issue and situation of that kind when the uncontradicted evidence is, that at the time Miss Waddell was killed and Davis received the injuries on account of which suits are brought, Miss Waddell was being driven to the General Hospital in the city of Baton Rouge. Plaintiffs' argument about the responsibility of the owner of an automobile, as the result of fault and negligence of his employee in driving the truck home, when such is his duty after the work of the day is over, is therefore not entered into. To enter into such a discussion would be taking up a question, not supported by evidence, and contrary to the evidence as to the destination of the truck at the time of the collision. According to the evidence, Wilmer Langlois in returning from the picnic or weinie roast was not driving in the service and employment of the water company, nor with its authority, knowledge, or permission, but, contrary to his duty, because his employer had forbidden him to drive the truck except when in the use and service of the water company. The Civil Code, art. 2320, provides that masters and employers "are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." As such was not the situation with Wilmer at the time in question, the water company is not answerable for his fault and neglect in driving at the time of the collision.

■ Plaintiffs contend that as the truck was intrusted to the keeping of Wilmer and Joseph Aubin Langlois day and night, that is, all the time, for use in connection with their work, the master and owner is liable in damages, even though it was not being driven, at the time of inflicting an injury, in the specific service and employment of the master and owner.

They take the position that where the employee has possession all the time, the posses-

sion of the employee is the possession of the employer, and that although the employer may drive off his road and out of his way on business of his own or for pleasure, his driving is within the scope of his employment, and if injury is sustained while doing so, due to his fault and negligence, the owner and master is liable. It is true Wilmer Langlois had possession of the truck all the time, but his possession was not exclusive; his father had, so far as we can see, a like right and authority to use the truck at any time in connection with his work. As to who had the superior right, the evidence does not show; so we take it that both had a like right, but neither had the right to drive it except when "in the exercise of the functions in which they are employed." Therefore, the truck, in going to the picnic and in returning therefrom to the General Hospital in Baton Rouge, was not being driven in the exercise of the functions in which the driver was employed. The truck had been driven home at the termination of the day's work. When Wilmer got into it again, after going home, for the purpose of driving to the picnic, it was not a continuation of the drive home, but the commencement of a new journey, a new drive, which, from its commencement at the home, until its termination at the place of collision, was not in the exercise of the functions in which he was employed, but in pursuit of his own private business and pleasure. In so far as concerns the water company, it was wrongful, illegal, and unauthorized from start to finish.

■ From Huddy on Automobiles we quote as follows: "It may be stated as a general rule that when the chauffeur or employee of the owner of a motor vehicle, or a third person not in his employ uses the same without the consent of such owner, the owner is not liable for the negligent conduct of the driver, unless such vehicle is being used in his business. Particularly is this so when the use of the car is contrary to the express instructions of the owner and for the pleasure or business of the chauffeur. And in such a case it is not of controlling importance that the driver was in the general employ of the owner and had the authority to use the car at certain times for certain purposes." Cyclopedia of Automobile Law, by Huddy, vol. 7 & 8 (9th Ed.) § 93, pp. 245, 246, 247, 248. Language in sections 91, 92, 94, 95, could be cited from the same author with numerous authorities under the sections explaining differences and distinctions; some from this state. But the language of section 93 is appropriate to the situ-

ation in the present case. The jurisprudence of this state, based on article 2320 of our Civil Code, is substantially as stated by Huddy. The case Valley v. Clay, 151 La. 710, 92 So. 308, is, we think, a sufficient reference as to the law of this state on that subject, but we also have in mind the decision of the Supreme Court in James et al. v. J. S. Williams & Son, Inc., 177 La. 1033, 150 So. 9, and for the reason given by the court in the cases just cited we think the water company not liable in the present case.

The plaintiff contends that Employers' Liability Corporation, Limited, of London, England, is liable, even though the water company is not.

This liability is claimed to result from a clause in the policy of insurance which the water company carries in the insurance company mentioned, which reads as follows: "This policy shall cover the assured named in the policy and any person while riding in or legally operating any of the automobiles described herein, and the protection granted by this policy is so extended as to be available in the same manner and under the same condition as it is available to the named assured, to any person, firm or corporation legally responsible for the operation of said automobiles, provided such use or operation is with the permission of the named assured; or if the named assured is an individual, with the permission of an adult member of the assured's household, other than a chauffeur or a domestic servant."

Having found that driving the truck by Wilmer Langlois from his home to the picnic, and on the return trip, in taking Davis and Miss Waddell to her destination in Baton Rouge, was not driving it with the permission and consent, express or implied, of the named assured, it follows that the demand of the plaintiffs Davis and of Frederick F. Waddell, against Employers' Liability Assurance Corporation, Limited, was properly rejected on that account.

The plaintiffs Waddell and Davis claim damages of Wilmer Langlois and Joseph A. Langlois on the ground that the fault and negligent driving of Wilmer Langlois resulted in the injury of Davis and the death of Miss Waddell. It is established that they were riding in the truck as the guests of Wilmer Langlois. The liability of the owner and driver of an automobile for injury to his guests while riding was considered at length by the Supreme Court in Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L. R. A. 1917F, 253. The

authority of that case has been generally followed since then, and we have it in mind as our guide at the present time.

The collision took place at about 10:30 p. m. Miss Waddell's employment required her to be at the hospital at 11 o'clock p. m. that night. The evidence does not indicate unusual darkness or other unusual atmospheric condition at the time, so we take it that the party driving and his guests, all seated on the front seat, could see ahead as far as he could ordinarily see.

As the accident occurred in 1931, the Act No. 296 of 1928 furnishes the legal regulations for driving on highways at that time.

The return trip after leaving the picnic was along the highway from Bayou Sara to Baton Rouge, and took place about a mile and half or two miles from the city limits. This highway crosses the Hammond & Eastern Railroad at a grade crossing, and is intersected at a distance which we estimate at between 50 and 100 feet before it reaches the crossing by another road known as the Choctaw road. The Choctaw road, under the definition of highway as contained in section 2, subsec. (n) of the act mentioned, must be deemed a highway. The Baton Rouge and Bayou Sara road is one of the main highways of the state; but the Choctaw road is not. The Bayou Sara road leads north and south; the Choctaw road east and west, and parallels the Baton Rouge, Hammond & Eastern Railroad along the north side of the same. The distance from the place where the Choctaw road intersects the Bayou Sara road, to the place where the Bayou Sara road crosses the Baton Rouge, Hammond & Eastern Railroad is not clear. A picture of the scene brought up in the record indicates that the intersection is within 30 or 40 or perhaps 50 feet of the railway crossing. But one of the witnesses in the case speaking of the distance between the place where the Choctaw road intersects the Bayou Sara road, and the place where the Bayou Sara road crosses the railroad, estimates it at about 10 feet; while another estimates it at about 100 feet, so we take it that the distance is likely as already stated, about 50 feet.

The evidence shows that when Wilmer Langlois started from the picnic toward Baton Rouge he had six people in the truck. He stopped at what is known as the Fuller place, about one mile north of the intersection, and there three got out, leaving remaining in the car, Wilmer Langlois, Miss Waddell, and Ernest Davis, the plaintiff, all seated on the front seat, with Miss Waddell in

between the young men. After starting up from Fuller's place the evidence is to the effect that the truck was being driven at the rate of 40 or 45 miles an hour. From the Fuller place to the intersection, the highway is straight and paved, and there are no obstructions to the view along the Bayou Sara road going south preventing anybody from seeing an automobile in the Choctaw intersection, except that it was at night and about as dark as usual. The evidence does not show, what kind of headlights the truck carried, but we assume that it complied with the requirements of the law. Section 50 of the act just mentioned requires headlights with power to clearly show a person on the road 200 feet ahead.

Presuming, in the absence of anything to the contrary, that the truck had headlights of this kind, an automobile stopped at the intersection of the Choctaw road was an object that should have been seen by Wilmer Langlois, Ernest Davis, and Miss Waddell far enough ahead to enable Wilmer to slow down or even stop if necessary, and Ernest Davis and Miss Waddell must and should have seen it, had they been looking ahead, in time to have warned Wilmer to slow down or stop before entering it, in case he did not timely do so without warning.

Wilmer Langlois testifies that as he came within about 100 feet of the place where the Choctaw road intersects the Bayou Sara road he saw an automobile pull up on the east side of the crossing and stop at the intersection; that when he saw the automobile stop he took it to mean that it yielded him the right of way because he was in the main highway, and that he then came on without checking his speed. The implication from what he says is that, if it had not stopped, he could and would have slowed down so as to let it pass ahead of him; that when he got within 10 or 12 feet of the intersection the stopped automobile suddenly started up and struck him as he went through the intersection, the blow striking his truck toward the rear on the left-hand side as he passed, causing it to swerve to the right as it crossed the nearby railroad and strike against an iron pillar on the right side of the road. It was this blow against the iron pillar that wrecked his truck and brought about the casualty that occurred.

The evidence shows that the automobile that had stopped at the intersection was in possession of and being driven by an unknown negro who had stolen it from a party who lived in the neighborhood. Act No. 12 of 1924 is not referred to by the parties, and

it has no bearing because for a checking of speed or a slowing down to have been effective in preventing a collision, the checking and slowing down must have commenced a proper distance from the intersection and further from the railroad than the act requires.

There is a contention that the negro driving the automobile in the Choctaw road entered the intersection first and pre-empted it, and that Wilmer should have heeded the pre-emption and stopped or slowed down so that the negro could pass ahead of him. Wilmer testifies that the negro stopped at the intersection, and he is corroborated and supported by the witness McQueen, apparently disinterested, who says he was close by looking at the negro and is positive that he stopped at the intersection. There is controversy as to what the witness McQueen says on the subject. We quote a part of his testimony:

"Q. Which way did he come from? A. From the east, going toward the west.

"Q. He came from a street that comes toward the Bayou Sara Road from the east? A. Yes.

"Q. And you say he stopped? A. He drove up there and stopped and then he pulled on ahead. He pulled in the road right ahead of this car coming down the road.

"Q. Did he pull out into the Bayou Sara Road? A. Yes. He looked like, the best I can remember, he was about half way the road when he stopped.

"Q. How far back into the intersection was he when he stopped? A. I don't know exactly.

"Q. Had he gotten up to the point where the front wheels of his car would touch the pavement on the Bayou Sara Road? A. Not when he stopped the first time.

"Q. As I understand it he stopped at a point east of the Bayou Sara Road and at a place where the front wheels of his car did not touch the pavement; is that right? A. No, Sir. He must have been 20 feet or more from the pavement when he suddenly came out of the road.

"Q. You said a while ago he came out. When he came out of this intersecting street, approximately how far away was the car of Langlois which I understand was travelling in a southernly direction? A. I could not tell just how far, but he was right close to him, he just drove out ahead of him.

"Q. Who drove ahead of the other one? A. I took it the negro done it. He drove right out across the highway.

"Q. How far into the highway did he get? A. The other car was about a little past the center of the highway."

In another place he said that he was standing within 20 feet of the pavement; that the negro drove up opposite him and stopped, then he pulled on across. In another place, speaking of the distance the Langlois car was at the time the negro started up, he says: "He could not have been, according to my judgment, more than 50 or 100 feet when the fellow ran out in front of him."

The witness McQueen also says the negro was halfway across the road when he struck the Langlois car. The fact that the negro did stop his car right at the intersection is testified to by another witness. We therefore feel that there is no doubt that the negro with the stolen car did drive close to the intersection of the Choctaw road with the main highway and stop, within sight of Wilmer Langlois and Davis and Miss Waddell then probably about 100 feet distant north, coming toward the intersection at about 40 or 45 miles an hour; therefore, giving credit to what the witness McQueen says, if the negro had not stopped he would have crossed the Bayou Sara road ahead of the Langlois truck and there would have been no collision. We think by stopping at the threshold of the intersection, within sight of Langlois who was coming on fast, the claim of Wilmer, that he was thereby deceived into not checking his speed, at a time when it could have been done, seems reasonable and we think his claim is supported, to the extent that it should be accepted as true.

The district judge says in his reasons for judgment: "It appears that the accident was due to the action of this negro, and was not due to any negligence on the part of Langlois." We agree with the lower court that the collision was due solely to the act of the negro in suddenly starting up his car and entering the intersection after he had stopped as if he were going to wait. If the negro had not acted as he did, there would have been no collision. Plaintiffs strongly contend, however, that Wilmer Langlois was also at fault, and that his contributory fault brought about the collision. It is claimed that he was driving at the time on the east or left side of the road, and that if he had not been violating the law of the road in that respect there would have been no impact and no injury.

Davis testified as a witness: "Q. Was the truck you were in on the right side or the left side on the middle of the road? A. We were kind of in the middle and on the left side of the highway."

But in a statement made by Davis on May 19, 1931, which was some 10 days after the occurrence, he said: "I imagine we were on the righthand side of the road, because just before the accident we were on the righthand side of the road."

Alton E. Carpenter appears to be a disinterested and credible witness. Mr. Carpenter says that there were a series of crashes, and that he arrived at the scene of the collision very quickly after it occurred; that there were culverts near the place on both sides of the road, and that one of them, on the east side, appeared to have been struck by something; that there appeared marks on the cement where something had skidded. There is no evidence indicating when it was done and it might have been done on some previous occasion. If done at the time of the present collision, for all we know, the automobile driven by the negro might have done it. Mr. Hanks came to the place right after the accident. He testifies that there were a series of crashes and that there was a car track and marks made in the gravel on the right-hand side of the highway going south. We take the witness to say that the marks to which he referred were off the cement on the right-hand side of the road. Wilmer Langlois testified that he was driving on the right-hand side of the road when struck. The weight of the evidence does not support plaintiff's contention on the subject.

The rule which gives the right of way to the party who enters first is a recognized rule, but we cannot apply it in favor of plaintiffs in the present case because the driver in the Choctaw road was not the first to enter the intersection. By stopping at the threshold of the intersection as the evidence shows that the negro did, his act was calculated to lead a party coming and nearby on the main highway, seeing him stop, to suppose that he yielded the right of way and to come ahead. The lower court held that the negro was the sole party at fault, and rejected plaintiffs' demands on the above grounds.

We agree with the lower court, but as Wilmer Langlois was driving, say 40 or 45 miles an hour, without checking his speed to cross the intersection, the provisions of Act No. 296, § 5 (a), and paragraph 3 under (b), must be taken into account. We therefore take his speed to be excessive and negligent in driving faster than 15 miles an hour in making this intersection at night. In taking

this position we must act on defendants' plea of contributory negligence. Considering the case from that standpoint, we have stated that the road was straight and unobstructed and the view of the intersection ahead good, except that it was night. That Wilmer Langlois, Ernest Davis, and Miss Waddell were all seated on the front seat. That the headlights of his truck presumably had power in accordance with the statute to show an automobile ahead stopped in the Choctaw road at its center intersection with the Bayou Sara road as they approached it for a sufficient distance ahead to enable Wilmer, had he been looking ahead, to slow down, check his speed, and even stop if necessary in order to avoid impact with it, and to enable his guests had they been looking ahead to warn him and protest his driving in case he otherwise did not heed the situation.

The death of Miss Waddell leaves only Davis as the other guest. He excuses his failure to see ahead by admitting that he was not looking.

In a statement obtained by a representative of the Employers' Liability Corporation, Limited, about 10 days after the collision, while he was in the hospital on account of his injuries, he says: "I must have been talking to Miss Waddell and not paying attention to the driving or other cars that we passed." His injuries were very severe and opiates had been administered to him, but the effect of these opiates must have passed away by the time he made the statement.

Plaintiffs criticize defendant's act in obtaining a statement from Davis while he was suffering from his injuries, for the purpose of defending the damage suit which he might bring against it on account of his injuries sustained in the collision. We have considered statements obtained in this way in many instances. Some have received but little effect, others have received more. The situation existing at the time the statement is obtained and the method used in obtaining are taken into account. For the purpose of analogy we refer to Revised Statutes of Louisiana of 1870, § 615, speaking of the duties of the officer. It is therein provided: "And thereupon said clerk shall proceed to take the testimony of such witnesses in writing, either by himself or some other disinterested person."

There is a wide difference between a deposition such as section 615 provides for and the statement obtained from Davis. The party obtaining this statement was not disinterested; he was in the service of the Employers' Liability Assurance Corporation. The language quoted from section 615 was commented on by the Supreme Court in Succession of Segura, 134 La. 84, 63 So. 640. A number of earlier cases are cited and others have been found, in all of which the requirement that the deposition be written by a disinterested person has been enforced. At the time of signing this statement, Davis was on a bed in the hospital and had to be lifted up in order to enable him to sign. Statements of the kind obtained from Davis should be obtained by some officer or other disinterested person; but the statement made by Davis in this case is corroborated. It is our conclusion that he was not paying attention to the speed of the automobile nor to the intersection ahead, just as he admits, and it is our conclusion that Miss Waddell was also not paying attention, otherwise they would have seen and realized all that they should have seen and understood, had they been looking and taking proper care as they went forward to the intersection. If they had been noting the speed and looking attentively ahead, they could and would have timely seen any danger that Wilmer saw or should have seen, and in time to warn him and protest against whatever he was doing or failing to do, that he should have done. The evidence shows that no protest was made; consequently they shared the responsibility with Wilmer Langlois for the collision that took place and the result of the same.

■ In Lorance v. Smith, 173 La. 884, 138 So. 871, 876, the Supreme Court, acting on a case in which they found facts somewhat similar to the present situation, approvingly quoted from 42 C. J. 1170, § 948: "A guest or a gratuitous passenger in a motor vehicle cannot recover for injuries due to the negligence of his host if he is aware of and acquiesces in the negligence. He cannot 'abandon the exercise of his own faculties and intrust his safety absolutely to the driver, regardless of the imminence of danger, or the visible lack of ordinary care on the part of the driver to avoid all harm. If he fails to use ordinary care, including the exercise of his own senses of sight, hearing and perception, to protect himself under such circumstances, he is guilty of contributory negligence.'"

The case Provosty v. Christy (La. App.) 152 So. 784, 785, has also received our consideration. In that case the guest did not have opportunity to speak and protest against the act of the driver; therefore, the case is not appropriate to the present situation.

It is our conclusion that if Wilmer ,Langlois, defendant, was at fault and negligent the plaintiff Davis and Miss Waddell shared his fault and negligence, and that their fault and negligence served, with that of Wilmer Langlois, to bring about the collision, the death of Miss Waddell, and the injury of Davis.

For these reasons, the judgment appealed from will be affirmed.

Judgment affirmed; plaintiff-appellant to pay the cost in both courts.