**UNITED STATES of America**

v.

**Leon BURAS, Jr., et al.**

**Civ. A. No. 4977.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

July 8, 1970.

---

7. AR 635–20 (July 31, 1970).

Herbert Pittle, John J. Cain, Attys., Dept. of Justice, Washington, D. C., Norton L. Wisdom, Sp. Asst. U. S. Atty., New Orlean, La., for plaintiff.

Phillip A. Wittmann, Warren A. Goldstein, of Stone, Pigman, Walther, Wittmann & Hutchinson, E. Drew McKinnis, Baton Rouge, La., for defendants 1–26.

Charles D. Marshall, and Wilson S. Shirley, Jr., of Milling, Saal, Benson, Woodward & Hillyer, New Orleans, La., for Chevron Oil Co.

Sidney C. Schoenberger, New Orleans, La., Luke Petrovich, Buras, La., for intervenors.

CHRISTENBERRY, District Judge.

On March 1, 1955, the United States, plaintiff, instituted this action against the heirs of Pierre Leon Buras, seeking to quiet its title to property located in Plaquemines Parish, Louisiana. The disputed property constitutes part of the Delta National Wildlife Refuge.[1] The

---

1. A description of the disputed lands is: The Northeast Quarter (NE¼), and the Southeast Quarter of the Southwest Quarter (SE¼ SW¼) of Fractional Section Twenty-three (23); The East Half (E½) of Fractional Section Twenty-six (26), Northwest of Main Pass; the East Half (E½) of Section Twenty- seven (27); the Southeast Quarter (SE¼), and the South Half of the Southwest Quarter (S½ SW¼) of Section Twenty-eight (28); The South Half of the Southwest Quarter (S½ SW¼) of Section Thirty-three (33); The Northwest Quarter (NW¼) of Fractional Section Thirty-four (34);

government also made its mineral lessees, Allen L. Lobrano and the heirs of Frank J. Lobrano, parties defendant as well as The California Company (now Chevron Oil Company) and Leiter Minerals, Inc.[2] "in order that all persons asserting any right or claim to the property may be before the court."

This litigation is the result of a state court suit filed on November 18, 1954, by the heirs of Pierre Leon Buras (hereinafter referred to as the Buras heirs) asserting title to the lands in dispute and seeking the eviction of the mineral lessees of the United States.[3] The instant action, brought pursuant to 28 U.S.C. § 1345[4] seeks to quiet the title of the United States and enjoin permanently the prosecution of the state court suit. A temporary injunction was not applied for due to an agreement between counsel that the state proceedings would not be prosecuted pending the final disposition of this case.

The Buras heirs answered the government's complaint admitting that the United States is presently the possessor of the disputed lands. But they denied that the government is the owner of the said lands or the mineral rights thereon, and have counterclaimed that they are the true and lawful owners of the said lands and mineral rights thereon. In addition, the Buras heirs filed a cross-claim against defendants Chevron Oil Company and the individual parties named Lobrano, seeking an accounting and money judgment against these parties for the extraction of minerals without right or legal authority. A trial by jury was demanded by the Buras heirs.

Subsequently, motions to strike the Buras heirs' demand for a jury trial were filed by the plaintiff, United States and by defendants, Chevron Oil Company and the individual parties named Lobrano. This court denied both motions and certified that decision for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). On February 23, 1967, the United States Court of Appeals for the Fifth Circuit denied the movers' application for leave to appeal from this court's interlocutory order.

On January 11, 1967, this court granted an unopposed motion for partial summary judgment on behalf of the plaintiff United States, quieting its title to an undivided one-half interest in the minerals and mineral rights in the disputed lands. This judgment was based on three compromise agreements: one between Leiter Minerals, Inc. and the Buras heirs; another between Leiter Minerals, Inc. and the United States, Chevron and others; and the third between the present parties to this suit.[5]

---

all in Township Twenty South (T 20 S), Range Nineteen East (R 19 E), St. Helena Meridian, Louisiana.
The East Half (E½) of Fractional Section Three (3) Northwest of Main Pass; and the Northeast Quarter (NE¼) and the Southwest Quarter (SW¼) of Fractional Section Four (4), Northeast of the Forty Arpent Lines; all in Township Twenty-one South (T 21 S), Range Nineteen East (R 19 E), St. Helena Meridian, Louisiana.

2. The Chevron Oil Company acquired operating rights under the mineral leases granted to the Lobranos by an agreement with them. Under the authority of these leases eight producing oil wells have been drilled on the lands in dispute. Leiter Minerals, Inc. by a compromise agreement dated July 25, 1966, was dismissed from the suit. See fn. 5 *infra.*

3. This suit is entitled Leon Buras, Jr., et al. v. The California Company, et al., No. 3577 of the records of the Twenty-fifth Judicial District Court for the Parish of Plaquemines, State of Louisiana.

4. 28 U.S.C. § 1345 states:
"Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

5. Thomas Leiter, in his sale to the United States on December 21, 1938, reserved the mineral rights subject to certain limitations. The mineral leases by the United States were executed on the understanding that this reservation had expired. However, Leiter conveyed the reserved rights to Leiter Minerals, Inc., Louisi-

Later, cross motions for partial summary judgment on the issue of title were filed by the Buras heirs and the government, Chevron, and the individual parties named Lobrano, and were subsequently denied by this court. A pretrial conference was held and this matter was set for trial.[6] However, on the scheduled date of trial, some thirteen years after the original filing of this action, a surprise motion to intervene was filed on behalf of the heirs of one Amelie Elodie Buras, purportedly the legitimated daughter of Pierre Leon Buras. These parties (hereinafter referred to as the intervenors) alleged that they are legal heirs of Pierre Leon Buras and are necessary parties to this suit. Following the court's granting of the motion to intervene, the United States, Chevron, and the individual parties named Lobrano

moved for and were granted a continuance of the trial date.

The Buras heirs subsequently moved for a summary judgment dismissing the intervenors and this court denied that motion. They later sought to have the intervenors' claims tried separately from the rest of the case. This motion was also denied.

A trial by jury commenced on April 17, 1969. The court reserved ruling on all motions for directed verdict and submitted the case to the jury using two sets of special interrogatories and a map.[7]

The jury answered all of the interrogatories save the first one of the first set and decision of this case is complicated by their inability to agree upon an answer to that question.

ana corporation, and in 1955, when the instant suit by the United States against the Buras heirs was filed, separate litigation was pending between the United States and Leiter Minerals, Inc. concerning the status of the Leiter mineral reservation. The claim of the Buras heirs being founded on title matters prior to Leiter's ownership of the lands, both of the claims were adverse to each other as well as to the United States. On August 19, 1958, the Buras heirs and Leiter Minerals, Inc. entered into a compromise between themselves, each side conveying to the other fifty percent of its claim to the mineral rights beneath the disputed lands. By a 1965 compromise agreement executed between Leiter Minerals, Inc., the United States, and other interested parties, Leiter relinquished all its claims, including the fifty percent interest it had acquired from the Buras heirs in the mineral rights beneath the disputed lands. Coincidentally, a separate compromise agreement was entered into between the Buras heirs, the United States and other interested parties, whereunder the Buras heirs relinquished any claim they had acquired from Leiter in Leiter's claim to the mineral rights beneath the disputed lands. Such agreement stipulated that the remaining claim of the Buras heirs through Pierre Leon Buras, defined as their original claim less the one-half of mineral rights transferred by the Burases to Leiter, was not being compromised. The result is that in

the instant litigation the claim of the Buras heirs continues for the entirety of the surface of the lands in dispute but is reduced to fifty percent of the mineral rights. In recognition of this, the court granted partial summary judgment on January 11, 1967, in favor of the United States, quieting its title to an undivided half interest in the minerals and mineral rights.

6. The large four-volume record in this case reflects the numerous conferences held, as well as the vast amount of discovery completed in this fifteen year old litigation.

7. The first set of interrogatories submitted to the jury contained questions as to the good or bad faith possession of the United States and its predecessors in title. The questions submitted in the second set of interrogatories to the jury pertaining to the adverse possession of the various possessors in the United States' chain, depended on the jury's answers to the good or bad faith questions in the first set. Also in the first set the jury was required to determine the navigability of various streams, which findings were transmitted to a map showing the streams and the various tracts which were separated by these streams. This map was used by the jury in its deliberations on the second set of interrogatories pertaining to the adverse possession of the various tracts.

## THE UNITED STATES' CLAIM

The United States seeks a decree quieting its title to the land in litigation, removing and canceling all instruments of the Buras heirs which evidence any claims to the land, these claims being clouds upon the title of the United States.[8] The government alleges that it is the owner and possessor of the property in dispute under a perfect record chain of title emanating from patents issued by the state of Louisiana and of record in the State Land Office at Baton Rouge. It further alleges that if any adverse claims to any of the land exist, these claims have been acquired by the government and its predecessors in title under acquisitive prescription based on ten or thirty-year adverse possession.

The property in question was acquired by the government from Thomas Leiter by deed dated December 21, 1938, and registered on December 28, 1938, in COB 92, folio 468 of the records of Plaquemines Parish, Louisiana. Thomas Leiter inherited the lands from the estate of his father, Joseph Leiter in 1932. The bulk of the disputed lands was acquired by Joseph Leiter from Malcolm J. Taylor and Fay S. Dean on May 29, 1916.[9] Taylor, Dean and Jefferson C. Wenck together purchased these lands from Augustin A. Buras on June 2, 1911, and Taylor acquired Wenck's interest on April 22, 1912.

Augustin A. Buras had acquired on May 11, 1911, some of the disputed lands directly from the state of Louisiana under patents of record in the State Land Office.[10] These lands were included in the sale by Augustin A. Buras to Taylor et al. The rest of the disputed lands included in the 1911 conveyance from Augustin A. Buras to Taylor et al. was acquired by Augustin Buras on July 17, 1906, from Dr. John N. Thomas, to whom Augustin Buras had previously conveyed on May 27, 1905. Augustin Buras originally had acquired the lands from Octave Barrois on November 12, 1903. Barrois acquired the lands under patents from the state of Louisiana dated October 23, 1903, of record in the State Land Office. It is from this chain of title that the United States bases its claim in this case.

Further, the United States has pleaded title by acquisitive prescription under the deed to it from Thomas Leiter in 1938, under the deed from Taylor and Dean to Joseph Leiter in 1916, and also under the deed from Augustin A. Buras to Taylor, Wenck and Dean in 1911.[11]

### THE BURAS HEIRS' CLAIM

The Buras heirs have answered the complaint of the United States, asserting

---

8. The government also seeks a permanent injunction enjoining the Buras heirs from asserting any rights to the disputed lands and a permanent injunction enjoining the Buras heirs from prosecuting the case of Leon Buras, Jr., et al. v. The California Company, et al., No. 3577 of the Docket of the Twenty-fifth Judicial District Court of the Parish of Plaquemines, Louisiana.

9. Included in this sale was the land on which the eight oil wells are now situated. The remainder of the lands in dispute was acquired by Leiter as follows: the SW ¼ of Sec. 4, T 21 S, R 19 E, by patent to Leiter directly from the state in 1918; the E ½ of Sec. 3, T 21 S, R 19 E, and NW ¼ of Sec. 34, T 20 S, R 19 E, by deed to Leiter from Delta Duck Club on November 28, 1921. The chain into Delta Duck Club on the latter lands goes back to a conveyance from Octave Barrois to

Nicholas Frey dated August 6, 1908, and Barrois acquired such lands under patents from the state dated October 23, 1903.

10. The following portions of the disputed lands were patented to Augustin A. Buras in 1911:
 The East Half of Fractional Section 26, Northwest of Main Pass, and the North Half of Southeast Quarter of Section 28, T 20 S, R 19 E, and the Northeast Quarter of Fractional Section 4, northeast of the forty arpent line, T 21 S, R 19 E.

11. The United States has also pleaded prescription under the 1918 patent to Leiter covering the SW ¼ of Sec. 4, T 21 S, R 19 E and under the Leiter acquisition through Delta Duck Club of the NW ¼ of Sec. 34, T 20 S, R 19 E and the fractional E ½ of Sec. 3, T 21 S, R 19 E.

title to the disputed lands under a deed from Octave Barrois to Pierre Leon Buras, their ancestor. The deed is dated January 5, 1899, and the sale was based on patents of the state of Louisiana to Octave Barrois dated November 12, 1898. These patents were recorded in the official conveyance records of Plaquemines Parish; however, their recordation cannot be ascertained in the State Land Office. The Buras heirs assert in their brief: "[T]he Barrois-Buras sale [of 1899] is the fountainhead of the ownership claim of the Buras heirs. Pierre Leon Buras never alienated the lands sold to him by Barrois, and by inheritance, his heirs have succeeded to his ownership."

Alternatively, the Buras heirs contend that if the 1898 patents issued to Octave Barrois are invalid and the later 1903 patents obtained by Octave Barrois are valid, then the title thus acquired by Barrois inured to the benefit of Pierre Leon Buras under the doctrine of after-acquired title by virtue of the 1899 recorded sale from Barrois to Buras prior to the issuance of the 1903 patents.

The Buras heirs further claim that there was no possession of the subject lands adverse to Pierre Leon Buras or his heirs, prior to 1917. Further, they contend that Joseph Leiter, one of the predecessors in title of the United States, abandoned possession of the lands from 1921 to 1927, a period of six years. This was supposedly the result of a hunting accident in which his ten year old son was killed.

Finally, the Buras heirs contend that the Government's acquisitive prescription period was interrupted when the Government "assured" the Buras heirs that their claims would be investigated; that such assurance lulled them into a false sense of security and that the Government should not be permitted to acquire by acquisitive prescription, to their prejudice.

### TITLE

The question of title in this case turns on (1) the validity of the 1898 patents issued to Octave Barrois and (2) the effect of the subsequent recorded sale from Barrois to Pierre Leon Buras in 1899.

Buras and Barrois were brothers-in-law who in the 1880's hunted and trapped in the area known as Cubit's Gap.[12] Barrois operated on the lands immediately below Main Pass, while Buras took as his operating area the lands north of Main Pass. Eventually, in 1894, Octave Barrois, having decided to apply to the State of Louisiana for purchase of a portion of these lands on which they were operating, paid some money to the Register of the State Land Office, John S. Lanier. Lanier issued a certificate to Barrois dated April 7, 1894, setting forth the land description, area, and amount paid in connection with the application. This certificate was duly recorded in the conveyance records of Plaquemines Parish. The testimony of the Buras heirs is to the effect that Pierre Leon Buras had furnished a portion of the money to Barrois to make the application.

On November 12, 1898, Barrois obtained patents on the lands for which he held Lanier's certificate. These patents were issued over the seal of the state and purportedly were signed on behalf of the state by then Governor Murphy J. Foster as well as Register Lanier. These patents were recorded in the official conveyance records of Plaquemines Parish. Barrois promptly executed the January 5, 1899 deed to Pierre Leon Buras conveying some 2355 acres of the lands on

12. The lands in dispute are marsh lands in the area known as Cubit's Gap, which extend eastward to the sea from the rear of the river lots along the Mississippi River in the vicinity of Main Pass. In ancient times there was little or no land to the rear of these river lots and the opening which today is Main Pass did not exist. However, in 1862 a ditch was dug connecting the River and the sea and from that ditch Main Pass, or Cubit's Gap, resulted. The lands of Cubit's Gap were subsequently built up by deposits from the waters of the river flowing through Main Pass.

the north side of Main Pass. This sale while without warranty was regular in every respect, having been passed before a notary public and two witnesses, and was properly recorded.

On July 16, 1900, Register Lanier committed suicide. An investigation of his activities by his successor, James M. Smith, revealed that Register Lanier's administration had been marked by negligence, mismanagement and dishonesty.[13] Regarding the Barrois patents of 1898, there was no record that any money was paid to the State Treasurer and also there was no record in the State Land Office of any sale of land to Barrois.[14] Smith, the new Register, took the position that he would not consider as valid any patents issued for which Lanier had received payment unless he could further determine that Lanier had deposited the money in the State treasury.

Precisely how Barrois discovered the presence of a potential defect in his patents is not known. But word of the new Register's position eventually reached various individuals in Plaquemines Parish, who wrote to Smith on behalf of Barrois.[15] After a meeting between Barrois, his attorney, and Register Smith on February 25, 1903, and subsequent letters between the parties, the state issued the 1903 patents to Barrois. On the Register's official "order-book" there was a notation in the margin regarding the land described in the 1903 patents:

"Applied for prior to Act 125 of 1902, and patents issued for same by the then Register, John S. Lanier. But no money having been paid into the State Treasury, and there being no evidence in the records of these entries, this order is now issued."

Further Barrois was given the benefit of a saving clause under Act 125 of 1902, relative to the purchase price to be paid. Act 75 of 1880 stipulated a purchase price in the amount of $12\frac{1}{2}\cancel{c}$ per acre. However, Act 125 of 1902 increased this price to $25\cancel{c}$ per acre, reserving to prior applicants the right to purchase at the former price and Barrois was permitted to pay the old price.

According to the records of the State Land Office, the first patents to Octave Barrois were issued on October 23, 1903. These patents are the foundation of the chain of title of the plaintiff, United States. Upon the issuance of these patents, Barrois proceeded to dispose of the

---

13. The initial investigation was primarily concerned with monies received by Lanier on applications for entry where no patents had been issued and contained a request for an opinion of the Governor as to the legal rights of the applicants:

"These applications cover a period of several years, but they were generally made from 1895 to July 14, 1900. A few were made prior to that date. Besides these my office is in receipt of letters claiming that other applications and remittances were made, giving dates and amounts of which I find no record. As none of this money has been turned into the State Treasury nor into my hands, I cannot allow the entries and issue patent therefor, and I would like to know the legal status of these applications, and what rights, if any, should be accorded to the applicants." (Defendants' [1–26] Ex. 4c.)

A further explanation of the condition of the records was made by the new Register when he submitted his Biennial Report for the years 1900–1902. That report revealed that Register Lanier had the sum of $1,107.04 on deposit in the Bank of Baton Rouge at the time the new Register took office and that the sum was transferred to the account of the new Register. The individual sources of this fund were never traced and to do so now would be impossible.

14. While the 1898 patents refer to various certificate numbers as underlying them, the certificates bearing those numbers were in fact issued to other persons and covered entirely different lands.

15. Letters were written to the new Register by Dr. John Thomas, who was in charge of the Quarantine Station; Mr. John Dymond, Jr., an attorney in Plaquemines Parish who represented Barrois; Mr. Jefferson C. Wenck, a New Orleans Notary Public, and Mr. William A. Wenck, a New Orleans attorney.

subject lands a second time.[16] He conveyed a part of the lands to Augustin A. Buras in 1903 and portions to Nicholas Frey in 1908. The government eventually acquired the lands from the succeeding transferees of Augustin Buras and Nicholas Frey.

After the conveyance by Octave Barrois to Augustin Buras in 1903, the lands conveyed were assessed to Augustin Buras and the later transferees in that chain of title descending into the United States. In 1908, in the succession proceedings of Pierre Leon Buras, his property was sold and partitioned, but no claim to the subject lands was mentioned.

## VALIDITY OF 1898 PATENTS

The first interrogatory submitted to the jury asked: "Did the Governor of Louisiana sign the 1898 patents to Octave Barrois involved in this case? Please answer yes or no." The jury considered this interrogatory and could not agree on an answer.

■ Initially, the problem that confronts this court is whether it can now answer this interrogatory. I am aware of the United States Court of Appeals for the Fifth Circuit's opinion in Roberts v. Pierce, 398 F.2d 954 (5th Cir. 1968), reversing a trial judge who directed a verdict after a jury's failure to agree had resulted in a mistrial. There the court said that the conflicting evidence presented a question for the jury. Further, the cases of Union Pacific Railroad Company v. Bridal Veil Lumber Co., 219 F.2d 825 (9th Cir. 1955), and Iacurci v. Lummus Co., 387 U.S. 86, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967), lend support to the view that this court should not "go it alone" and answer the question. 219 F.2d at 831–832. In light of this jurisprudence, a conference was held on March 25, 1970, with all counsel present to discuss the matter. The court

has now decided that the first interrogatory presented a legal question and that it was a mistake to have submitted it to the jury. Only questions of fact, not law, are to be put to a jury. *Cf.* Ratigan v. New York Central Railroad Co., 291 F.2d 548, 555 (2d Cir. 1961), cert. denied sub nom. New York Central R. R. Co. v. Interstate Commodities, Inc., 368 U.S. 891, 82 S.Ct. 144, 7 L.Ed.2d 89 (1961). And while on its face this interrogatory seeks an answer to a question of fact the real question involved is one of law, namely, whether or not the 1898 patents are valid, and in answering this question consideration must be given to the effect of legal presumptions. The originals of the 1898 patents were not produced. That such patents were issued is evidenced by handwritten copies of the patents certified to by the Recorder for the Parish of Plaquemines as having been recorded in the Conveyance Records of the Parish on January 2, 1899. The validity of these patents involves questions of law. To expect or require a jury to decide these questions would give the jury "an unnecessary legal workout which was far beyond their comprehension, and outside their sole function to decide issues of fact." Ratigan v. New York Central Railroad Co., 181 F. Supp. 228, 232 (N.D.N.Y.1960).

■ While the United States has invoked the jurisdiction of this court under 28 U.S.C. § 1345, the case is governed by the law of Louisiana, both statutory and jurisprudential. Leiter Minerals, Inc. v. United States, 329 F.2d 85 (5th Cir. 1964), remanded with directions to dismiss, 381 U.S. 413, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965). *Cf.* Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); United States v. Certain Property, etc., 306 F.2d 439 (2d Cir. 1962). The plaintiff, United States, has set forth its title to the disputed lands

---

16. The 1903 patents issued to Barrois included practically all those lands covered by the 1898 patents that had been sold by Barrois to Pierre Leon Buras on January 5, 1899. The rest of these lands

were subsequently patented in part to Augustin A. Buras in 1911 (see fn. 10 *supra*) and in part to Joseph Leiter in 1918 (see fn. 9 *supra*). The government later acquired these lands.

**1026**

emanating from the state of Louisiana by virtue of the 1903 patents to Octave Barrois. Its possession of these lands are admitted by the Buras heirs. Since the Buras heirs have asserted title to land which is in the possession of the United States, they have the burden of proving their title. Manhattan Land & Fruit Co. v. Buras, 43 F.Supp. 361, 365 (E.D.La.1942). *Cf.* Arent v. Hunter, 171 La. 1059, 133 So. 157, 162–163 (1931). They have attempted to sustain this burden by introducing certified copies of the 1898 patents issued to Octave Barrois as they were recorded and indexed in the conveyance records of Plaquemines Parish and the deed executed by Barrois to Pierre Leon Buras, the Buras heirs' ancestor, dated January 5, 1899, which deed purported to convey to Pierre Leon Buras, without warranty, all of the lands here in dispute. The heirs also introduced the record from Plaquemines Parish of a "statement of costs" issued by Register Lanier to Octave Barrois in 1894, which shows that Barrois applied to purchase the disputed lands.

The United States disputes the validity of the 1898 patents and contends that as a third party it was not charged with knowledge of the issuance of these patents since there is no record of them in the State Land Office in Baton Rouge.

■ Generally, a patent recorded in the State Land Office gives notice to third parties. Recordation of a patent in the conveyance records of the parish in which the land is located is not required. Kittridge v. Breaud, 2 Rob. 40 (1842); Tear v. Williams, 2 La.Ann. 868 (1847); St. Paul v. Louisiana Cypress Lumber Co., 116 La. 585, 40 So. 906 (1906); McQueen v. Flasdick-Black Land & Lumber Co., 135 La. 698, 65 So. 900 (1914); Chalmers v. Frost-Johnson Lumber Co., 143 La. 836, 79 So. 424 (1918). The government contends that the corollary of this jurisprudence is that recordation of a patent in the records of the parish where the land is

situated is not notice to third parties. This is a non sequitur. In all the cases cited above, there was no prior patent recordation in the situs parish before the issuance of any other patents by the state.

The public records doctrine in Louisiana emanates from the provisions for recordation contained in the Civil Code, Articles 2251–2266.[17]

Article 2264 provides:

"Notarial acts concerning immovables, effective date as against third persons

2264. No notarial act concerning immovable property shall have any effect against third persons, until the same shall have been deposited in *the office of the parish recorder, or register of conveyances of the parish where such immovable property is situated.*" (Emphasis supplied.)

Article 2265 provides:

"Recordation of judicial sales, marriage contracts and judgments affecting immovables

2265. All sales of immovable property made by any sheriff or other officer, by virtue of any execution or other order of court; all marriage contracts made within this State, tending in any wise to convey, transfer, assure or affect the estates of the parties, or being only intended to ascertain the dotal rights of the wife, or that her marriage portion is liable to some reserves, or stipulated to be paraphernal or extradotal property; and all final judgments affecting immovable property *shall be recorded in the parish where the immovable property is situated.*" (Emphasis supplied.)

Article 2266 provides:

"Effectiveness of unrecorded acts affecting immovables; effect of subsequent recordation

2266. All sales, contracts and judgments affecting immovable property, *which shall not be so recorded,* shall be utterly null and void, except be-

---

17. See also La.Const. art. 19, § 19 (1921), as amended by La.Acts 1938, No. 35.

tween the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.

The recording shall have effect from the time when the act is deposited in the proper office, and indorsed by the proper officer." (Emphasis supplied.)

It is clear from a reading of these articles that recordation in the parish where the land is located is public notice to third parties.[18] Even if an act is actually recorded, but could not be found from the indices because it is not indexed properly, it is nevertheless effective against third persons. Central Lumber Co. v. Whittington, 12 La.App. 695, 127 So. 79 (2d Cir. 1930); Agurs v. Belcher & Creswell, 111 La. 378, 35 So. 607 (1903). While it is not necessary to record a patent in the parish where the land is located, it does not follow that if a patent is duly recorded, such recordation will not constitute public notice.

Perhaps the strongest case that the government relies on in support of its argument is Ellis v. Louisiana Planting Co., 146 La. 652, 83 So. 885 (1920). There a conflict existed between the records of the State Land Office and the Terrebonne Parish records regarding what tracts of land had been conveyed by the state. The court said that the record in the State Land Office governed and that the *subsequent* recordation in Terrebonne Parish was of no benefit to the plaintiff. In the same case, regarding another tract of land, the court held that a prior certificate of entry recorded in the Land Office which was followed by a patent prevailed over a subsequent conveyance by the state prior to the issuance of the patent. On

the issue of notice of the entry the court said:

"This receipt *may or may not be recorded,* as the entryman chooses, *but the record which the register is required to keep* is the thing to which one dealing with the property is required to look to ascertain whether or not it is still susceptible of purchase or entry. The purpose of the record is to afford notice to all those dealing with the state that property entered thereon has been removed from the class which can be disposed of by it until such time as the entry is canceled or confirmed by patent. The certified copy or exemplification from the land office was admissible in evidence, not for the purpose of establishing title in Young, or his subsequent vendees, but to show that the defendants and their vendors had notice of the fact that the property was not among that which the state owned, in the sense that it was susceptible of transfer at the time Act 97 of 1890, granting to the levee board lands 'which it now owns or may hereafter acquire' within said district, was passed." 83 So. at 886 (emphasis supplied).

It is important to note the differences between the *Ellis* case and the instant one. In *Ellis* there was a prior record of certificates of entry in the State Land Office before the state alienated the land to the other party. In the instant case, there is no record of any kind prior to the recordation of the patent in the situs parish. In *Ellis*, the Register did his statutory duty according to Act 75 of 1880, § 3, which provides in part:

"Sec. 3. *Be it further enacted, etc.,* That it shall be the duty of the register to keep accounts of the sales of lands donated to the State, in well

---

18. La.R.S. 9:2721 (1950) provides:
"2721 Filing in office of parish recorder
No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties

unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties. Acts 1950, 2nd Ex.Sess. No. 7, § 1."

bound books, with the number of the certificate issued therefor, setting forth the section, parts of sections, township and range, district and parish, to whom and when sold, and for what price, and shall cause to be marked on the official plats or maps on file in his office the number of certificates, which books and maps shall be preserved as official records. * * * "

■ In the instant case, the Register did not record the 1898 patents. This was a duty statutorily imposed on him, not on Barrois, the patentee. The rationale of the jurisprudence holding *sales* effective against third persons if the instrument is deposited for recordation and endorsed by the proper officer, even though never actually recorded, is applicable here. Schneidau v. New Orleans Land Co., 132 La. 264, 61 So. 225 (1913). The Register was the proper officer to record these patents and there is no reason to impose his failure to perform his statutory duty on Barrois, especially so, in view of the fact that Barrois did record the patents, where he could do so, in the parish where the land was located. Finally, in the *Ellis* case, the land was situated in Lafourche Parish and the recordation relied on by the plaintiffs was in Terrebonne Parish. The court said that since there was a prior record of the plaintiff's claim in the State Land Office "[t]he question of registry does not enter into the matter, since plaintiff has a valid title, and defendant has not." In the instant case there was recordation of the patents in the parish where the land was situated and there is, again, no prior record anywhere to antedate this patent recordation. *Cf.* Coyle v. Allen, 168 La. 504, 122 So. 596 (1926).

■ ■ At this point, it is important to remember that the recordation serves only as notice to third parties and is not in itself a source of any rights. In recording his patents Barrois protected against third parties any interests that the patents conveyed to him. The fact that they were recorded outside the chain of title held by the United States is of no moment. What is important is that they were properly recorded on the public records in the parish where the land is located, and that third parties are charged with knowledge of every material fact contained in those records. Any unrecorded interests which are subject to the recordation law are "utterly null and void" as to third persons, even if they have actual knowledge of the unrecorded interest. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909).

In Egle v. Constantin, 198 La. 899, 5 So.2d 281 (1941), the court said in dicta that the public was not charged with notice of a patent until it was recorded in the parish where the land was located. That case dealt with the validity of a tax sale and did not involve an issue of conflicting patents. However, the court's gratuitous statement there lends support to the view of this court that recordation in the situs parish is public notice.

Further, La.R.S. 13:3726 (1950) is indicative of the legislative view concerning the recordation of patents in the situs parish. It provides:

"Public land patent, certificate or receipt; admissibility of copy of record

Where a patent for land, or the certificate of the register, or the receipt of the receiver, whether issued, or to be issued, by the officers of the State of Louisiana, or the general government has been, or may hereafter be *recorded in the office of the recorder of the parish in which the land may be situated,* a copy of such record properly certified .by the parish recorder, shall be admissible in evidence in all causes pending before any of the courts, in the same manner, and shall be entitled to the same credit as the original of such instruments, or as exemplification thereof; provided, the party proposing to use such evidence shall make affidavit that the original of such patent or certificate is not in his possession or under his control. However, the opposite party shall be allowed to disprove the genuineness of such origi-

nal or registry, as the case may be."
(Emphasis supplied.)

The historical context of this statute is relevant here. In 1855, the state by Act 290 of the 15th of March of that year (page 350 of the Acts of 1855), created a land office at the seat of government, to be administered by the register of the said office who was to be appointed by the Governor, with the consent of the Senate. Betz v. Illinois Central R. Co., 52 La.Ann. 893, 24 So. 644, 646 (1898). On January 26, 1861, the state of Louisiana seceded from the Union by passage of an ordinance of her secession convention. The same convention passed an ordinance under which the state assumed ownership and control of all unappropriated public lands within its boundaries, including the public lands of the United States. The legislature, on February 28, 1861, by Act 44 (page 33 of the Acts of that year) appointed a committee to examine and report on the situation of the Louisiana public lands of the state and the United States.

It was in this context that Act 55 of 1861 (page 41 of the Acts of that year) was passed on March 1, 1861. That act was the antecedent of the present La. R.S. 13:3726 which tracks the language of its predecessor almost verbatim. It may appear that this statute is merely evidentiary, since it provides for the admissibility of copies of patents duly recorded in the parish where the land is located. However, it appears that another purpose of this statute was to allow a holder of a patent from the United States (general government) to prove his title claim by evidence of the patent's recordation in the situs parish since the records of the United States probably were not available due to the state's secession and the impending Civil War.[19]

It is important to note the statute provides that a patent must have been duly recorded to be effective against third persons. This is consistent with this court's view of the public records doctrine. The statute includes, not only patents of the general government, but also those issued by the state of Louisiana. Finally, the subsequent reenactments of Act 55 of 1861 to Rev.St.1870 § 1445, to La.R.S. 13:3726 (1950), demonstrate the legislative intent with respect to the notice effect of a patent's recordation in the parish where the land is situated.

For these reasons, this court holds that the United States as a third party was charged with knowledge of the 1898 patents since they were duly recorded in Plaquemines Parish, the parish where the land is located.

The thrust of the government's argument disputing the validity of the 1898 patents is that they are procedurally defective. It contends that a valid purchase from the state was not consummated, since there is no record of any money being paid by Barrois to the State Treasurer pursuant to the provisions of section 4 of Act 75 of 1880 and that Register Lanier was without authority to receive payment for the patents.[20]

---

19. On the 21st day of March, 1861, the legislature by virtue of Act 267 (page 205 of Acts of that year) established a general land office and remodeled entirely the land system of the state. This, in effect, repealed Act 290 of 1855, which had established the state land office. Betz v. Illinois Cent. R. Co., 52 La.Ann. 893, 24 So. 644, 648 (1898).

20. Section 4 of Act 75 of 1880 provides:
"That all money arising from the sale of warrants of public land shall be paid by the purchaser to the State Treasurer, on the warrant of the Auditor of Public Accounts, whose duty it shall be to warrant at once on the Treasurer of the State to receive said money within forty-eight hours after the issuance of the same by the Auditor."
The above extract is from a copy of the original enrolled bill certified by the Secretary of State of the State of Louisiana as being a true and correct copy of Act 75 of 1880. (See Defendants' [1–26] Ex. 10).

The Government contends the words "warrants of public land" should read "warrants or public land" since this is the wording in the promulgated version of the statute as printed in the session laws of 1880. Further, the remnant provisions of this statute as they appear today in La.

Further, there is no evidence of any certificates of purchase having been issued by the State Treasurer to Barrois underlying the 1898 patents.[21]

■ One problem with the government's attack is its procedural capacity to maintain it. A patent issued is evidence showing complete and absolute divestiture of title of the state. In Simien v. Perrodin, 35 La.Ann. 931 (1883), the court recognized that while a receiver's receipt or certificate of purchase had some legal effect, it was not of equal dignity with a patent. *Cf.* Burton Swartz Cypress Co. v. Baker-Wakefield Cypress Co., 163 La. 992, 113 So. 219 (1927). A patent is conclusive until it is set aside in a judicial proceeding. In Stone v. United States (United States v. Stone) 2 Wall. 525, 535, 69 U.S. 525, 535, 17 L.Ed. 765 (1865), the Court said:

"A patent is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. * * * Patents are sometimes issued unadvisedly or by mistake, where the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially, and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the acts of his predecessor. That is a judicial act, and requires the judgment of a court."

This principle of law is applicable even in the case of a patent issued under an unconstitutional act of Congress. *In re* Emblen, 161 U.S. 52, 56, 16 S.Ct. 487, 40 L.Ed. 613 (1896). In Vavoline Oil Co. v. Concordia Parish School Board, 216 So.2d 702, 706 (La.App. 3d Cir. 1968), the court stated:

"These lands were actually sold and a patent issued. The jurisprudence of this state is established that patents, valid on their face, are presumed valid until revoked by a judgment of court in judicial proceedings instituted for that purpose."

■ In the instant case Register Smith, Lanier's successor, apparently did not regard the 1898 patents issued initially to Barrois as valid, since he initiated the issuance of the subsequent 1903 patents to Barrois. However, it is clear that he had no authority to do so. He could not declare the 1898 patents invalid at his own whim. In the case of Prater v. Craighead, 118 La. 627, 43 So. 258 (1907), Register Smith followed a different procedure to cancel an illegal patent. The statement of the case by the court states:

"That the pretended patent to B. A. Hampton for said land was issued

R.S. 41:7 uses the word "or" rather than "of."

Louisiana courts have long held that clerical errors, misprints, improper translations, grammatical mistakes, and improper punctuation in a statute may be recognized and corrected by the courts to carry out the real intention of the legislature. Succession of Barr, 219 So.2d 817 (La.App.2d Cir. 1969), writ refused, 254 La. 5, 222 So.2d 64 (1969); Scurto v. Le Blanc, 191 La. 136, 184 So. 567 (1938); State v. Rogers, 148 La. 653, 87 So. 504 (1921); City of Crowley v. Police Jury of Acadia Parish, 138 La. 488, 70 So. 487 (1915). Obviously, this court must follow the express intention of the Louisiana legislature and construe

the act as originally enacted. *Cf.* Mataya v. Delta Life Ins. Co., 222 La. 509, 62 So.2d 817 (1953); Black v. Louisiana Central Lumber Co., 161 La. 889, 109 So. 538 (1926). However, this construction is not relevant to the court's opinion as will be shown later.

21. Section 14 of Act 75 of 1880 requires: "*Be it further enacted*, etc., That it shall be the duty of the Governor when applied to, to issue patents for all lands sold, on presentation of the Treasurer's receipt and for lands located by warrants, whenever he shall be satisfied that the same have been legally sold and located."

through an error on the part of the register or clerk in the land office at Baton Rouge, and that, when the error was discovered by James M. Smith, register of the land office, the said illegal patent to Hampton was promptly and duly canceled on the 5th day of December, 1899, with full and legal notice to him and to any and all persons claiming title by or through or under him, which *judgment* was duly recorded in Book of Conveyances in St. Mary parish on January 8, 1904." 43 So. at 260 (emphasis added).

It is strange that Smith took court action in that case to cancel the alleged illegal patent while he took no such action with regard to the Barrois 1898 patents. With these patents, he apparently *sua sponte* decided that the state should issue a second set of patents—the 1903 patents. It is this duplication of patents that created the dual title chains that are the basis of this lawsuit.

■ Once the state of Louisiana divested itself of ownership of the disputed lands by the 1898 patents it had no interest in those lands that it could convey in 1903. It could not by any act transfer any interest in that property in 1903, if the 1898 patents are valid. The presumption is that they are valid since they have not been judicially attacked for over fifty years.

The government, however, contends that the 1898 patents are invalid because the state never received any consideration for them as evidenced by the absence of any record of certificates of purchase issued by the State Treasurer to underlie these patents.

Attacks on patents have generally been restricted to either the sovereign that issued them or to a claimant who can show an equitable or legal title claim to the patented land *that existed prior to the issuance of the patent.* Smith v. Crandall, 118 La. 1052, 43 So. 699 (1907). In Albritton v. Shaw, 148 La. 427, 87 So. 32 (1921), the Louisiana Supreme Court established two prerequisites for an attack on a patent by an individual:

"The two prerequisites of the right of an individual to attack the validity of a land patent are: First, that the individual making the attack had an equitable title or an inceptive right upon the land, *antedating* the issuance of the patent; *and,* second, that the attack is aimed at the jurisdiction or legal authority of the officers of the land department to issue the patent." 87 So. at 34 (emphasis supplied).

■ The government cannot meet these prerequisites as its title emanates from the patents issued in 1903, *subsequent* to the 1898 patents. But it does not attack Albritton v. Shaw, *supra.* Rather, to repeat, it takes the position that the 1898 patents are invalid because no consideration was ever paid to the state. It is argued that these patents being inherently invalid are not protected by the collateral attack rules set out in the above cases. In Smith v. Crandall, *supra,* the question of the legality of patents issued in 1881 was before the court. They were attacked on the ground that the patented lands were illegally purchased for scrip, instead of money, the court held that the "plaintiffs are without standing to maintain an action to annul such patents." Specifically, the court said:

"The question of the validity of land patents is one between the state and the patentees, or their assigns. Plaintiffs had no inchoate rights of any kind in or to the lands granted at the date of the issuance of the patents. Plaintiffs, therefore, have no standing to question the validity of the patents on the ground of the alleged improper or illegal location of the scrip issued to John McEnery." 43 So. at 700.

This case is analogous to the instant one. The government does not have any rights that antedate the 1898 patents and, at first blush, it would appear that it is precluded from maintaining an attack on these patents. However, none of the cases cited above involved an attack on patents which derive their presumption

of validity from La.R.S. 13:3726 *et seq.*[22] This statute specifically provides, *inter alia,* that where a patent for land has been recorded in the office of the parish recorder where the land is situated, a copy of such record properly certified by the parish recorder shall be admissible in evidence and entitled to the same credit as the original of such instrument. The statute further provides that "the opposite party shall be allowed to disprove the genuineness of such original or registry, as the case may be." A rebuttable presumption of validity is created by the statute. However, it is not clear whether the party attempting to rebut this presumption is required to meet the limitations imposed by *Albritton, supra* and *Smith, supra.* This question is one not answered by Louisiana jurisprudence. It is not necessary, however, for this court to answer that question, for assuming that the government has the right to rebut the presumption of validity, it has failed to do so. The evidence offered by the government on the issue of the validity of the 1898 patents is meager and falls short of overcoming the statutory presumption. There has been no clear and convincing evidence to show that the patents are invalid. Absolutely no evidence was offered to disprove the genuineness of the Governor's signature as presumed under La.R.S. 13:-3727. *Cf.* Watkins v. Zeigler, 147 So.2d 435 (La.App.2d Cir. 1962). The government has offered proof of the fact that the patents of 1898 had erroneous specific numbers and book and page numbers of the patent record books in the Land Office, where they were supposedly recorded. Further, the government has shown that treasurer's certificate numbers upon which the 1898 patents were purportedly issued relate in fact to other parties, patents, and lands than those in question in this lawsuit. This argument, however, does not recognize that these patents as recorded in Plaquemines Parish set forth a description of the land patented, purport to transfer title and are regular on their face, having been signed by the Governor. Parenthetically, it is incredible that the Recorder of Plaquemines Parish would record a patent that was not signed by the Governor and not regular on its face. The title conveyed by the patents cannot be rendered void simply because the numbers on them do not correspond with the records in the State Land Office. The patents were recorded in the parish where the lands are located and the failure of the Register properly to record or index the

---

22. La.R.S. 13:3727 provides:
 "Written acts recorded twenty-two years admissible
 In every instance where the conveyance records in the office of the clerk of court or of the parish recorder in any parish of the state show that any deed, conveyance, sale, lease, transfer, assignment, power of attorney, or other written act whatsoever, whether the instrument be notarial in form, be a private act, be attested or unattested, or whether the signature of the maker or makers thereof be acknowledged or unacknowledged, or proven or unproven, shall have been recorded in the records for a period of not less than twenty-two years, it shall be presumed that the original instrument of which the record purports to be a copy bore the genuine signature of the maker or makers, and a copy of the recordation of any such instrument, certified by the clerk of court or any of his deputies, or by the parish recorder or any of his deputies, of the parish where the instrument in question was recorded, shall be received and admitted in evidence in the courts of Louisiana, without proof of signature of the maker or makers of the original act, and shall be deemed prima facie proof of the contents of the original instrument referred to in the certified copy."
 La.R.S. 13:3730 provides:
 "Same; acknowledgment or proof of authenticity not required
 It shall be unnecessary for any ancient document, as defined in R.S. 13:3729, to be acknowledged or proven as provided by any act, statute or other law of the state in order for such ancient document to be admitted in evidence, and it shall be unnecessary to prove the execution of such document, the mere fact of such instrument having been recorded for a period of thirty years, as herein provided, being sufficient to establish a prima facie presumption of the execution and of the genuineness of such instrument."

patents in the State Land Office cannot divest title, especially so, where as here, the heirs of an innocent transferee (Pierre Leon Buras) of the patentee (Octave Barrois) are attempting to assert title.[23] In State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833 (1927), the court said:

"It is hardly necessary to consider the defendant's plea that the state had no right to assail collaterally, in a petitory action against an innocent transferee holding title from the patentee, the original patents, which are apparently valid. There seems to be no doubt about the proposition that a land patent, *if not void on its face*, is not only a conveyance of the title for the land, but is in the nature of an official declaration by that department of the government in which the sale of the public lands is intrusted by law that all of the requirements preliminary to the issue of the patent were complied with, and that declaration, or presumption, is not open to rebuttal in an action at law against an innocent transferee of the title from the patentee." (emphasis supplied) (citations omitted) 113 So. at 838.

In St. Louis Smelting & Ref. Co. v. Kemp, 104 U.S. 636, 26 L.Ed. 875 (1882), the Court said:

"The execution and record of the patent are the final acts of the officers of the government for the transfer of its title, and as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the government to which the alienation of the public lands, under the law, is intrusted, that all the requirements preliminary to its issue have been complied with. The

presumptions thus attending it are not open to rebuttal in an action at law. It is this unassailable character which gives to it its chief, indeed, its only value, as a means of quieting its possessor in the enjoyment of the lands it embraces." 104 U.S. at 640–641.

Further, the United States Court of Appeals for the Fifth Circuit in La Terre Co., Inc. v. Billiot's Shell Island, 103 F.2d 53 (5th Cir. 1939), said:

"When it is determined that an entryman or purchaser of public lands has done all that is required of him, and the land is subject to entry or sale, the issuance of the patent is a mere ministerial act, even though the ascertainment of the necessary prerequisites requires an administrative determination." 103 F.2d at 55.

These decisions give support to this court's view that the statutory prerequisites for issuance of patents in 1898 as provided in Act 75 of 1880 were complied with. Since there is no evidence of any wrongdoing on the Governor's part or of any forgery of his signature, there is a presumption that he performed his ministerial duty according to law and validly issued the 1898 patents. Any doubt raised by the government's evidence about these patents is not sufficient to overcome the statutory presumption that they were validly issued.

Accordingly, this court holds that the 1898 patents issued to Octave Barrois validly conveyed legal title of the disputed lands to him and that the recorded sale from Barrois to Buras in 1899 vested title in Pierre Leon Buras and his heirs.

### EFFECT OF THE SUBSEQUENT SALE

Since this court holds that Barrois had title when he executed the 1899 deed to Buras, the question of whether the doc-

---

23. The second special interrogatory propounded to the jury and its answer was: "2. At the time of the January 5, 1899 sale from Octave Barrois to Pierre Leon Buras was Pierre Leon Buras aware of any wrongdoing on the part of the Regis-

ter of the State Land Office or was he otherwise aware of any question that could affect the validity of the 1898 patents? Please answer yes or no. Answer: 'No'."

trine of after-acquired title would apply to this sale, which was made specifically excluding warranty, is moot.

## PRESCRIPTION

The government has asserted a claim of ownership based on ten and/or thirty years acquisitive prescription. At the conclusion of the trial, the jury was adequately charged by the court on the elements of acquisitive prescription and the adverse possession needed to acquire by prescription. They answered all of the interrogatories that were propounded to them on these questions adversely to the government's claims, and this court finds no reason to disturb their responses.

Finally, two other legal issues remain to be considered:

## INVERSE CONDEMNATION

■■■ The government contends, in the alternative, that it has acquired the disputed lands by eminent domain under the principle set forth in United States v. Dow, 357 U.S. 17, 78 S.Ct. 1039, 2 L. Ed.2d 1109 (1958). In *Dow* the Court said the United States could take property pursuant to its power of eminent domain in one of two ways. It can institute condemnation proceedings under federal statutes providing authority for such taking, or it can take physical possession of property without authority of a court order. When the latter, a taking by physical seizure, is employed, there are no condemnation proceedings. In this situation, the property owner's remedy is a suit to recover just compensation under the Tucker Act, 28 U.S.C. §§ 1346(a) (2) and 1491. This physical seizure is the "inverse condemnation" relied on by the Government in this case. However, the Court in *Dow* also noted that:

"[I]n both classes of 'taking' cases— condemnation and physical seizure—

title to the property passes to the Government only when the owner receives compensation, see Albert Hanson Lumber Co. v. United States, 261 U.S. 581, 587, [43 S.Ct. 442, 67 L.Ed. 809,] or when the compensation is deposited into court pursuant to the Taking Act * * *." 357 U.S. at 21–22, 78 S.Ct. at 1044.

In the instant case, neither of these two events has occurred. The government has not paid the Buras heirs any compensation for the taking of the disputed lands nor has it deposited any money for this purpose in this court. Thus title to the property has not vested in the government and this contention must fall. *Cf.* United States v. Gallas, 269 F.Supp. 141, 150 (D.Md.1967).

## CLAIM OF THE INTERVENORS

Intervenors are descendants of one Amelie Elodie Buras. These parties contend that they are legal heirs of Pierre Leon Buras and are necessary parties to this suit. The Buras heirs opposed this intervention on the grounds that there is no genuine issue of material fact that Amelie Elodie Buras is not a legitimate child of Pierre Leon Buras and as a matter of law, her heirs should be dismissed from this lawsuit. In the intervenors' original petition they alleged that Amelie Elodie was the daughter of Pierre Leon Buras and Eleonore Buras, born prior to their marriage and legitimated pursuant to article 198 of the Louisiana Civil Code. That article provides for legitimation of children born out of marriage by the subsequent marriage of their father and mother, whenever both parents have acknowledged them as their children.[24] However, as a result of pre-trial discovery, it was determined that Eleonore Buras, the al-

---

24. Louisiana Civil Code article 198 provides:

"Legitimation by subsequent marriage of parents

Art. 198. Children born out of marriage, except those who are born from an incestuous connection, are legiti-

mated by the subsequent marriage of their father and mother, whenever the latter have formally or informally acknowledged them for their children, either before or after the marriage."
(As amended Acts 1944, No. 50; Acts 1948, No. 482, § 1).

leged mother of Amelie Elodie, was only eight years older than Amelie. Subsequently, counsel for the intervenors abandoned their argument that Amelie was legitimated pursuant to Article 198, admitting that Eleonore Buras was not Amelie Elodie's mother. Now, they contend that her mother was some unknown woman who was never married to her father, Pierre Leon Buras. It is further asserted that Amelie Elodie was legitimated pursuant to article 198, ad-of Act 37 of 1831 (page 86 of the acts of that year) which were in force in 1868 when the marriage certificate was executed.[25] Counsel for the intervenors and the Buras heirs have stipulated to the English translation of the marriage certificate which states:

> Pierre Leon Buras and Eleonore Buras Feb. 25
>
> "February 25, 1868, I, the undersigned parish priest of Notre Dame de Bon Port, after having obtained the dispensation of the second degree of consanguinity and accorded that of a bann, have blessed the marriage of Pierre Leon Buras, legitimate son of Jean Pierre Buras and of Amelie Buras, born and living in this parish, on the one part, and of Eleonore Buras, legitimate daughter of Cyprien Buras and of Melozie Buras, born and living in this parish, on the other part.

The parties having obtained the license of the judge and recognized and adopted as legitimate his daughter Amelie Buras.

> Cyprien Buras
> Pierre Leon Buras
> Hippolyte Buras
> Jean Pierre Buras
> Pierre Phelix Buras
>
> /s/ Parish Priest"

The pertinent statute, Act 37 of 1831, which was in effect in 1868 provided:

> "Sect. 1.
>
> Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened, That so much of the article two hundred and seventeen, of the Civil Code, as abolishes all other modes of legitimation except that by marriage, be, and the same is hereby repealed, and that law seventh, title fifteenth, of the fourth partidas, which was repealed by said article of the Code, be and the same is hereby received; and that natural fathers or mothers shall have the power to legitimate their natural children, by acts declaratory of their intention, *made before a notary and two witnesses:* Provided, That nothing herein contained, shall be so construed as to enable a white parent to legitimate a colored child, nor to prevent a free person of color to legitimate his colored children: Provided, the natural children are the issue of parents who might, at the time of con-

---

25. Louisiana Civil Code article 200 and La.R.S. 9:391 are derived from Act 37 of 1831. They provide respectively:
"Legitimation by notarial act
Art. 200. A natural father or mother shall have the power to legitimate his or her natural children by an act passed before a notary and two witnesses, declaring that it is the intention of the parent making the declaration to legitimate such child or children. But only those natural children can be legitimated who are the offspring of parents who, at the time of conception, could have contracted marriage. Nor can a parent legitimate his or her natural offspring in the manner prescribed in this arti-

cle, when there exists on the part of such parent legitimate ascendants or descendants."
"§ 391. Legitimation of natural children
Natural fathers and mothers shall have power to legitimate their natural children, by acts declaratory of their intentions, made before a notary public and two witnesses; provided there existed at the time of the conception of such children, no other legal impediments to the inter-marriage of their natural father and mother except those resulting from color or the institution of slavery."

ception, have contracted marriage; and Provided, That there do not exist, on the parent legitimating his natural offspring, ascendants or legitimate descendants

Sect. 2. Be it further enacted, That the article three thousand three hundred and nineteen, of the Civil Code, be, and the same is hereby repealed.

Sect. 3. Be it further enacted, That the provisions of this act shall be in force from and after its passage." (Emphasis added.)

■ The intervenors contend that Pierre Leon Buras fulfilled the requirements for legitimation under this act by having the marriage certificate executed. They admit that the certificate was not signed by a notary but contend that the signature of the parish priest is sufficient. Specifically, they argue that the requirement that an act be passed before a notary public is only directory and not mandatory. As authority for this proposition, the case of Davenport v. Davenport, 116 La. 1009, 41 So. 240 (1906), is relied on. In that case, an act of legitimation was executed by a notary public whose commission had lapsed. The court held that even if, at the time the act was executed he, the notary, was not a notary de jure, "if a person holds a commission as one [a notary public], and acts as one, and has the reputation to be one, he is clearly one under the principle of the law of officers de facto." 41 So. at 241. This doctrine of de facto notary was also applied in Succession of Segura, 134 La. 84, 63 So. 640 (1913). Yet, neither in the *Davenport* case nor in any Louisiana jurisprudence has there ever been an indication by any Louisiana court that the requirement of Civil Code article 200 (which is derived from Act 37 of 1831) that an act be passed before a notary is merely directory. The Louisiana Supreme Court has said that

the methods of legitimation provided for in Civil Code articles 198 and 200 and in La.R.S. 9:391 are exclusive. Succession of Tyson, 186 La. 516, 172 So. 772 (1937). A notarial act is the only way a parent can legitimate his illegitimate child if he does not marry the other parent. Since the purported act of legitimation in this case was not executed by a notary public, it does not meet the requirements of Louisiana law and it must be found invalid.

As an alternative argument, the intervenors contend that the Louisiana laws of successions which allow legitimate children of a descendant to inherit in preference to his illegitimate children is unconstitutional as it violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In support of this argument they rely on the United States Supreme Court cases of Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), and Glona v. American Guarantee & Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968).[26] The *Levy* case held that to deny illegitimate children damages for the wrongful death of their parents solely because they were illegitimate was in violation of the Equal Protection Clause of the Fourteenth Amendment. However, the purpose of a wrongful death statute and that of the laws of succession are not the same. One allows tort recovery by creating a cause of action. The other provides for the orderly distribution of a decedent's estate. It does not follow that the distinction between legitimates and illegitimates for purposes of inheritance is unconstitutional, merely because illegitimates cannot constitutionally be denied the right to recover damages in a tort action for the death of a parent. See Strahan v. Strahan, 304 F.Supp. 40 (W.D.La.1969),[27] and Succession of Vin-

---

26. The *Glona* decision allowed a parent of an illegitimate child to recover for that child's wrongful death. The court's rationale was the same as used in *Levy*. For this reason, the two cases are treated as one in this opinion.

27. *Strahan v. Strahan* is now pending in the United States Court of Appeals for the Fifth Circuit Appeal No. 29052.

cent, 229 So.2d 449 (La.App.3d Cir. 1969), holding that Louisiana laws of succession are not unconstitutional under the *Levy* decision. But see Estate of Jensen, 162 N.W.2d 861 (N.Dak.1968), and R— v. R—, 431 S.W.2d 152 (Mo. 1968).[28]

 This court, however, finds it unnecessary to decide the question of whether or not *Levy* requires invalidation of Louisiana's succession laws as they affect illegitimates. Under Louisiana law, the capacity or incapacity of an heir is determined at the moment of the opening of a succession. La.Civil Code art. 950; Murdock v. Potter, 155 La. 145, 99 So. 18 (1924); and a succession is opened by the death of the person who is to be succeeded. La.Civil Code arts. 934, 978. Pierre Leon Buras died in 1908, and to apply the *Levy* rationale to his succession now would be giving that decision retroactive effect. This court holds that if the *Levy* case is applicable to succession law, in the light of the facts of this case, it should be given prospective effect only.

The Constitution neither requires nor prohibits the retroactive application of a ruling. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1964). In *Linkletter,* a criminal case, the Court stated "the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective." 381 U.S. at 628, 85 S. Ct. at 1737. Further, it said that no distinction is drawn between civil and criminal litigation in deciding whether to apply a ruling retrospectively or prospectively, and in support of this statement, cited the cases of United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), and Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940). In *Chicot, supra,* the Court stated:

"The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, or prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination." 308 U.S. at 374, 60 S. Ct. at 319.

Assuming that the Supreme Court would apply *Levy* to Louisiana succession law, it is doubtful that the Court would make such application effective retroactively for to do so would make "confusion worse confounded." This is particularly true in a case such as this where the ancestor died more than sixty years ago. As stated by Judge Dawkins in *Strahan v. Strahan, supra:*

"There simply must be a method for prompt and final definitive determination of valid ownership of real property left by a decedent. Louisiana feels that the proper way to insure this is to know who the claimants to a decedent's property are and to recognize the legally instituted claimants as owners shortly after a succession is opened. To hold that an illegitimate child may one day—perhaps many years later—come along and assert an interest in adjudicated property would devastate the orderly transmission of immovable property. 'All titles would be insecure, and the intercourse between man and man would be very seriously obstructed, if this principle be overturned.' Fletcher v. Peck, 10 U. S. 87, 6 Cranch. 87, 133, 3 L.Ed. 162 (1810)." 304 F.Supp. at 43.

Accordingly, judgment must be entered dismissing the intervention.

---

28. Louisiana, by virtue of its civil law ancestry, distributes a decedent's estate in accordance with its unique forced heir- ship method. La.Civil Code art. 1493 (1870). This distinguishes its inheritance laws from those of the other 49 states.

The defendant Buras heirs are entitled to a judgment consistent with this opinion and with the jury's answers to the interrogatories.